UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| SPECTRUM NORTHEAST, LLC<br><br>and<br><br>CHARTER COMMUNICATIONS, INC.,<br><br>Plaintiffs,<br><br>vs.<br><br>AARON FREY, in his official capacity as<br>Attorney General of the State of Maine,<br><br>Defendant. | **COMPLAINT FOR PERMANENT INJUNCTIVE RELIEF AND DECLARATORY RELIEF**<br><br><br>Case No. _____ |

Plaintiffs, SPECTRUM NORTHEAST, LLC, and CHARTER COMMUNICATIONS, INC. (collectively "Charter"), by its undersigned attorneys, bring this complaint for declaratory and injunctive relief against Defendant AARON FREY, in his official capacity as Attorney General of the State of Maine.

**NATURE OF THIS ACTION**

1.      Spectrum Northeast, LLC ("Spectrum Northeast") is a franchised cable operator that provides cable television, internet, and telephone services to customers in Maine.  Charter Communications, Inc. ("CCI") is the parent entity of Spectrum Northeast and provides certain billing and other services to Spectrum Northeast in support of its provision of cable service.  In this action, Charter seeks injunctive and declaratory relief to prevent the State of Maine from unlawfully regulating the rates that Charter charges its cable subscribers.

2.      Charter sells and bills subscribers for cable service in advance and in monthly increments (the "whole-month billing policy").  Under this policy, Charter offers cable service to subscribers on a monthly basis and requires subscribers to pay in advance of the ensuing month's

cable service.  Consistent with this policy and Charter's Terms of Service, a subscriber who chooses to cancel service in the middle of the billing period will not receive a rebate, but may continue to receive service for the balance of the month if he or she so chooses.  Since June 23, 2019, Charter has included a notice of this policy on its monthly subscriber bills in Maine, and continues to do so.

3.      Charter's decision not to provide a partial-month rebate for cancelling subscribers reflects the fact that Charter's service is sold on a monthly basis.  It also reduces administrative costs and thus ultimately reduces the upward pressure on rates for Charter's continuing subscribers.  The policy also reflects the competitive reality that many of Charter's most significant competitors (*e.g.*, DIRECTV, DISH, Sling TV, AT&T TV Now, Hulu + Live TV, Amazon Prime, and Netflix) sell their service on a monthly basis and do not provide a pro-rata rebate to terminating customers.

4.      This case arises from Maine's recent decision to enact Public Law Ch. 657, "An Act To Require a Cable System Operator To Provide a Pro Rata Credit When Service Is Cancelled by a Subscriber" (the "Act").  The Act, which goes into effect on June 16, 2020, requires Charter and other cable providers to prorate their subscriber bills when a subscriber cancels in the middle of a billing cycle.

5.      The Act is squarely preempted by Title VI of the Communications Act of 1934 ("Cable Act"), which expressly bars states and localities from regulating the rates of a cable operator where the Federal Communications Commission ("FCC") has determined that the operator faces effective competition from other video providers.  47 U.S.C. § 543(a)(2).  The FCC has specifically found that Charter faces effective competition in Maine.  The FCC subsequently established a presumption that all cable operators in the country are subject to effective

competition, a presumption that has not been challenged by the State or any of the towns in Maine that serve as cable "franchising authorities" under federal law.

6.      The Act is quintessential rate regulation.  Charter charges its cable subscribers by the *month*; the Act requires it to charge subscribers by the *day* by mandating a credit for each day of the month the subscriber does not wish to pay for service.  A federal court recently enjoined enforcement of a similar proration requirement on preemption grounds.  *See Altice USA, Inc. v. N.J. Bd. of Pub. Utils.*, No. 319CV21371BRMZNQ, 2020 WL 359398, at *8, *10 (D.N.J. Jan. 22, 2020) (granting preliminary injunction), *appeal docketed*, No. 20-1773 (3d Cir. Apr. 10, 2020).

7.      The Act also imposes substantial burdens on CCI specifically.  CCI operates the billing systems and customer service centers for Spectrum Northeast and other of its subsidiaries on a regional basis.  Among other costs, the Act requires CCI to modify its billing system, which handles all of its service offerings, to create an exception for cable television service in Maine, just one of the services it provides there.  It also requires CCI to re-train personnel in its regionally-based customer service centers to address cable-related inquiries from Maine.  None of these costs and the others discussed below could be recouped in the event that the Act is deemed preempted.

8.      Charter is therefore entitled to injunctive and declaratory relief to prevent Maine from violating its rights under federal law.

## THE PARTIES

9.      Spectrum Northeast, doing business as "Charter Communications," is a Delaware limited liability company with its principal place of business in Missouri.  Spectrum Northeast, LLC holds several franchises to provide cable service in Maine and is engaged in the business of providing cable, internet, and voice services to residential, commercial, and governmental subscribers in Maine.

10.     CCI is a corporation duly organized under Delaware law, with its principal place of business at 400 Atlantic Street in Samford, Connecticut.  CCI, through various subsidiaries and affiliates, owns and operates cable systems in 41 states, including in Maine.  CCI is the parent entity of Spectrum Northeast.

11.     Spectrum Northeast is a "cable operator" within the meaning of 47 U.S.C. § 522(5) because it provides cable service over a cable system and owns a significant interest in such cable system, as defined in 47 U.S.C. § 522(6)-(7).  Spectrum Northeast is also a "franchisee" within the meaning of Section 3010 of Title 30-A of the Maine Revised Statutes because it is a cable system operator that has been granted a franchise by a municipality in accordance with Section 3008 of Title 30-A.  Me. Rev. Stat. tit. 30-A §§ 3008, 3010.

12.     Defendant Aaron Frey is sued in his official capacity as Attorney General of the State of Maine.

13.     The Attorney General is charged with enforcing the Maine Unfair Trade Practices Act.  Me. Rev. Stat. tit. 5 § 209.  The Attorney General's authority to enforce the Maine Unfair Trade Practices Act includes the authority to bring an action to enforce provisions of the Act, which are codified in Me. Rev. Stat. tit. 30-A § 3010.  *See* Me. Rev. Stat. tit. 30-A § 3010(7) ("A violation of any provision of this section is a violation of [the Maine Unfair Trade Practices Act].").  Thus, Defendant is responsible for enforcing the Act against Charter when it goes into effect.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over Charter's claims pursuant to 28 U.S.C. § 1331 because this case involves equitable and declaratory relief seeking to enforce a claim of preemption under the Supremacy Clause of the United States Constitution, article VI, clause 2 and under the federal cause of action in 42 U.S.C. § 1983.

15.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because the

amount in controversy exceeds $75,000 and the action is between citizens of different states.

16.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because the Defendant

has his official office in, and therefore resides in, the District of Maine.  *Id.* § 1391(c)(2).

17.     Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the

events giving rise to the claim occurred in this District.

18.     Under Local Rule 3(b), this action is properly filed in the Bangor Division of this

Court because a substantial part of the events giving rise to Plaintiffs' claims for relief occurred in

Kennebec County.

## FACTUAL AND LEGAL ALLEGATIONS

**I.     Federal Law Prevents Maine From Regulating Rates Of Cable Service, Including The
Service Provided By Charter.**

19.     The Cable Act , 47 U.S.C. §§ 521 *et seq.*, establishes a national regulatory regime

for cable operators, cable services, and cable systems.  The FCC is the federal agency with primary

responsibility for implementing the Cable Act, which it has done through the adoption of

regulations and policies over the 35 years since the statute was first enacted.

20.     The Cable Act requires a cable operator to obtain a franchise from a state or local

franchising authority in order to provide cable service, *see* 47 U.S.C. § 541(b)(1) ("[A] cable

operator may not provide cable service without a franchise.").  As a result, local franchising

authorities and cable providers enter into franchise agreements.[1]  Franchising authorities may

exercise authority over cable operators and cable systems only in a manner consistent with the

federal framework established by the Cable Act and the FCC's implementing regulations.  *Id.*

---

[1] In Maine, local governments serve as franchising authorities.

§ 544(a).  State and local regulations that are inconsistent with the federal framework are expressly preempted.  *Id.* § 556(c).

21.     Of particular relevance to this case, the Cable Act prohibits states and franchising authorities from regulating the rates of a cable service if the FCC has found that cable service is subject to effective competition.  47 U.S.C. § 543(a)(2); 47 C.F.R. § 76.905(a).

22.     Spectrum Northeast is subject to effective competition in Maine.  Beginning in 2008, the FCC issued a series of orders finding Spectrum Northeast's predecessor in interest, Time Warner Cable, was subject to effective competition in 198 communities in Maine, and revoking the certification for Maine towns to regulate Time Warner Cable's cable service rates.[2]

23.     Maine did not appeal these FCC orders, nor has it subsequently sought recertification to regulate Spectrum Northeast's rates.  *See* 47 C.F.R. § 76.916.

24.     Further, in 2015, the FCC adopted a rebuttable presumption that all cable systems in the United States are subject to Competing Provider Effective Competition.  *In re Amendment to the Commission's Rules Concerning Effective Competition*, Report and Order, 30 FCC Rcd 6574 (2015) (codified at 47 C.F.R. § 76.906).

25.     The rules implementing this presumption of effective competition required that a franchising authority affirmatively seek and receive certification before regulating the rates of any cable service within its jurisdiction.  47 C.F.R. § 76.910.  Neither Maine nor any local franchising authorities in Maine have ever submitted the written certification required to rebut the presumption of effective competition.

---

[2] *See In re Time Warner Cable Inc. Time Warner Entertainment-Advance/Newhouse Partnership*, Memorandum Opinion and Order, 23 FCC Rcd 6559 (MB 2008); *In re Comcast Cable Communications, LLC Time Warner Cable, Inc.*, Memorandum Opinion and Order, 23 FCC Rcd 6883 (MB 2008); *In re Time Warner Cable Inc.*, Memorandum Opinion and Order, 23 FCC Rcd 7131 (MB 2008); *In re Time Warner Cable Inc.*, Memorandum Opinion and Order, 25 FCC Rcd 5438 (MB 2010).

26.     As a result, Spectrum Northeast is subject to effective competition throughout Maine.  Maine is thus prohibited from regulating the rates charged by Spectrum Northeast for cable service.

## II.     Charter Sells Service On A Monthly Basis And Its Terms And Conditions Of Service Require Subscribers To Pay Bills In Monthly Increments.

27.     Charter sells its cable programming services for a fixed dollar amount on a monthly basis.  Except in limited circumstances, Charter does not advertise, sell, or charge for cable services in increments of less than one month.

28.     Charter's monthly subscription and billing plans are an integral part of its rate-setting and pricing model.

29.     Charter's Terms and Conditions of Service have long made clear that Charter sells a monthly product and that subscribers who terminate service mid-month are not entitled to a rebate for the remainder of that month.  *See* Terms and Conditions of Service ¶ 6 (subscribers "shall be responsible for the full monthly charge (without pro-ration) for those Services that are offered on a monthly subscription basis to which the Subscriber has subscribed, regardless of Subscriber's termination of such monthly Service prior to the conclusion of the respective subscription month," to the extent consistent with applicable law).[3]

30.     Previously, although Charter's Terms and Conditions did not provide for prorating, Charter would, upon subscriber request, provide a pro-rata credit after disconnection.

31.     Effective June 23, 2019, Charter ceased its practice of providing pro-rata rebates to terminating subscribers in Maine, bringing its charging practices into alignment with its Terms and Conditions.  Thirty days prior to implementing this change, Charter provided notice to

---

[3] *Spectrum Terms of Service / Policies*, Spectrum (last visited Apr. 23, 2020), https://www.spectrum.com/policies/residential-terms.html.

subscribers in Maine and to franchising authorities (*i.e.*, local governments) where it provides service in the State.

32.     Charter continues to provide an additional notice on every bill for subscribers in Maine as a reminder of the whole-month billing policy.

33.     Charter's cable subscribers know in advance when the next monthly billing cycle will begin and therefore have ample opportunity to make a decision about whether they want to purchase Charter's services for the upcoming month before that billing period begins.  If the subscriber chooses to cancel before the next billing period begins, he or she will not be charged for service for that month.

34.     Charter expects that its whole-month billing policy will reduce the upward pressure on rates for continuing subscribers by reducing costs associated with implementing pro-rata rebates for mid-month cancellations.  Charter also believes this practice will minimize subscriber confusion associated with changes they make to the Charter services to which they subscribe.

35.     Charter's practice of whole-month billing, including for terminating subscribers, also brings its rate policies in line with those of its competitors, which include satellite providers such as DIRECTV and DISH, and internet-delivered multichannel video providers such as Sling TV, AT&T TV Now, Hulu + Live TV, Amazon Prime, and Netflix, none of which, per their terms of service, prorate their services.  *See infra* ¶ 3.  None of these other providers is subject to Maine's new proration requirement.

36.     Requiring Charter to prorate the amount charged to subscribers who terminate service mid-month constitutes rate regulation because it effectively mandates the sale of cable service on a daily basis, rather than on the monthly basis on which Charter offers it.

III.     **Maine Impermissibly Asserts The Authority To Regulate Charter's Rates By Requiring Proration.**

37.     On March 17, 2020, the Maine legislature passed Maine Public Law Ch. 657.  The Act amends Title 30-A Maine Rev. Stat. § 3010 and governs non-exclusive franchises for cable television such as the franchise held by Charter.  The Act was signed by the Governor on March 18, 2020.  By operation of law, the Act goes into effect June 16, 2020.  Me. Const. art. IV, pt. 3, § 16; Maine State Legislature, http://legislature.maine.gov/ (last visited Apr. 22, 2020).  As an operator of a cable franchise in Maine, Spectrum Northeast is subject to the Act.

38.     Charter submitted written testimony before the Act was passed to the Joint Standing Committee on Energy, Utilities and Technology of the Maine Legislature, noting that the bill violates federal law and "would unfairly penalize Charter and other cable operators and put them at a marketplace disadvantage compared to their satellite and online competitors."[4]  .

39.     Section 1 of the Act provides: "A [cable] franchisee shall grant a subscriber a pro rata credit or rebate for the days of the monthly billing period after the cancellation of service if that subscriber requests cancellation of service 3 or more working days before the end of the monthly billing period."  Section 2 of the Act requires cable operators to give notice to consumers of the right to proration set forth in Section 1.

40.     Maine law provides for penalties in the event that a franchisee, such as Spectrum Northeast, does not comply with the Act.  A violation of any provision of § 3010 is a violation of Maine's Unfair Trade Practices Act, Me. Rev. Stat. tit. 5 §§ 205-A *et seq.*, which provides for civil

---

[4]   The written testimony of Charter Communications, Inc., is available at http://legislature.maine.gov/backend/app/services/getDocument.aspx?doctype=test&documentId =141446.

enforcement of the act, including penalties.  *See* Me. Rev. Stat. tit. 30-A, § 3010(7); Me. Rev. Stat. tit. 5 § 212.

41.     The Act's proration requirement regulates Charter's rates by dictating the structure of the rates that Charter can charge cable customers.  Regulation of the increment of time charged for service—*e.g.*, per minute, per day, per month—is rate regulation.

42.     Rate regulation is preempted when a cable service provider has been deemed subject to effective competition, as Spectrum Northeast has been in Maine.  *See* 47 U.S.C. § 556(c). The proration requirement in the Act is therefore preempted by federal law.

43.     Nor can the Act avoid preemption on the ground that Maine purportedly adopted it as a consumer protection measure.  Federal law permits a state to "enact[] or enforc[e] any consumer protection law, *to the extent not specifically preempted by this subchapter*."  47 U.S.C. § 552(d) (emphasis added).  But, as explained above, federal law specifically preempts state rate regulation where, as here, the cable system is subject to effective competition throughout the state. *Id.* § 543(a)(2).

## IV.     Compliance With The Maine Act Will Cause Irreparable Harm To Charter.

44.     As a result of the new law, Charter faces an untenable choice: either refuse to comply with the likely preempted and therefore unconstitutional law and face liability and loss of customer goodwill; or adhere to the regulation, suffer the injury of obeying the regulation that is likely preempted while challenging the regulation, and incur large costs of compliance.

45.     As the First Circuit has recognized, being forced to comply with an invalid law, including a preempted law, is irreparable harm where it results in non-compensable costs.  In order to comply with the Act, Charter would have to undo the significant and costly steps it has already taken to implement its whole-month billing policy.

46.     First, requiring proration for a single state, and for cable services, but not other services like internet and voice services that are aggregated on the same bill, would require modifications to the coding of CCI's billing system, especially with respect to the numerous subscribers who receive a bill for a bundle of services (*e.g.*, cable and internet access).  Adding to the complexity and cost is that CCI does not have a specific billing system for Maine, so these changes would have to be made in the context of a nationwide billing system.  Reconfiguring the relevant billing system to comply with the terms of the Act would take at least six months and cost CCI hundreds of thousands of dollars.  During the period that the reconfiguring of the billing system were taking place, Charter would have to prorate customer bills manually, requiring additional time and cost.

47.     If Charter were forced to comply with the Act, it would also have to retrain employees regarding the policy change in Maine while the case is pending, only to reverse the change again if it were to prevail in defending its whole-month billing policy.  Charter does not have Maine-specific customer service representatives.  Rather, CCI operates several regional call centers that handle incoming subscriber queries from across its entire national service footprint, including Maine.  CCI has spent substantial time and resources training its customer service representatives to explain and implement the whole-month billing policy, including how to respond to a range of potential customer scenarios that may arise as the policy is implemented.  It invested significant resources in this training, none of which it would be able to recoup if the policy were reversed or suspended.

48.     When Charter implemented whole-month billing in June 2019, it provided Maine subscribers advance notice of the policy change.  Were Charter required temporarily or permanently to suspend its whole-month billing policy in Maine, it would have to expend

substantial resources to re-notify its Maine subscribers of this change, engendering customer confusion and a resulting loss of goodwill.  That confusion will only double if the Court ultimately holds that the Act is preempted, allowing Charter to reinstate its whole-month billing policy at the end of these proceedings.  Charter's standing with customers could also be negatively impacted if repeated changes to the policy result in cost-of-service increases.

49.     The customer confusion likely to arise from creating an exception to Charter's whole-month billing policy in Maine will in turn likely increase the volume of calls to Charter's customer service representatives.  Consumer confusion and resulting calls are likely to both increase Charter's costs of providing service and decrease subscriber satisfaction and goodwill.

50.     Additionally, Charter has found that its prior practice of proration allowed some subscribers to subscribe to its service for a single event, such as a sporting event, and then terminate the service as soon as the event was over, which, multiplied over many subscribers, increases Charter's costs and the number of transactions it has to handle.  These costs would recur under the Act.

51.     The forced re-imposition of a proration requirement in Maine would also frustrate Charter's objective of moving toward uniform pricing and packaging, and the resulting benefits of lower costs and simpler procedures, all in derogation of the Cable Act's preemption of local rate regulation where Charter faces effective competition.

52.     If Maine is allowed to regulate Charter's rates in this manner, other states and municipalities could follow suit and adopt similar regulations, notwithstanding the legal precedent recognizing such regulations are preempted.  That would result in Charter facing a nationwide patchwork of rate regulation that is impermissible and unwarranted under the FCC's nationwide presumption of effective competition.

53.     In addition to these immediate and substantial harms, forcing Charter to begin prorating in Maine would put Charter at an ongoing competitive disadvantage.  Many of Charter's competitors, none of whom are subject to the Act, sell and charge for their services as Charter does—through one rate imposed on a monthly, advance basis and without proration.  For example, Charter competitors DIRECTV,[5] DISH,[6] AT&T TV Now,[7] Amazon Prime,[8] Hulu + Live TV,[9] Netflix,[10] and Sling TV[11] all bill in advance of providing service and do not provide rebates or pro-rata credits when subscribers cancel their service during a billing cycle.

54.     The burdens on Charter would not dissipate even if Charter were able to prevail in defending its policy in an enforcement action brought by Defendant.

---

[5] *DIRECTV Residential Customer Agreement*, AT&T (effective Dec. 20, 2019), https://www.att.com/legal/terms.dtv_residentialCustomerAgreement.html ("Your cancellation is effective on the last day of the billing cycle in which you cancel (exceptions may apply to certain promotional periods and must be in writing) and you will not receive a prorated credit or refund for any portion of Service cancelled (subject to applicable law).").

[6] *Residential Customer Agreement*, DISH (last updated Jan. 2020), https://www.dish.com/downloads/legal/residential-agreement.pdf ("Prices, fees and charges, once charged to your account, are non-refundable, and no credits, refunds, price reductions or any other form of compensation will be provided in connection with the cancellation or disconnection of Services.").

[7] *AT&T TV Now Terms of Service and End User License Agreement*, AT&T (last visited Apr. 22, 2020), https://www.atttvnow.com/terms-and-conditions ("We do not provide refunds or credits for any partial-month periods or unwatched Content.").

[8] *Amazon Prime Video Terms of Use*, Amazon.com (last updated Jan. 1, 2020), https://www.primevideo.com/help/ref=atv_hp_nd_cnt?nodeId=202095490 ("If you cancel [outside the trial period], we will refund your full membership fee only if Digital Content available as part of your video-only membership has not been accessed through your account since your latest membership charge."); *see also Amazon Prime Terms*, Amazon.com (last updated Dec. 27, 2018), https://www.amazon.com/gp/help/customer/display.html/ref=prime_pdp_prime_assist_terms?nodeId=13819201 (disallowing subscription fee refund unless the customer has not used Amazon Prime during the billing cycle).

[9] *Terms of Service*, Hulu, www.hulu.com/terms#section4 (effective Sept. 27, 2019) ("If you cancel your subscription, you will continue to have access to the Service through the end of your current Billing Period. . . . If you cancel, modify your subscription, or if your account is otherwise terminated under these Terms, you will not receive a credit, including for partially used periods of Service.").

[10] *Netflix Terms of Use*, Netflix (last updated Apr. 24, 2019), https://help.netflix.com/legal/termsofuse ("Payments are nonrefundable and there are no refunds or credits for partially used periods.  Following any cancellation, however, you will continue to have access to the service through the end of your current billing period.").

[11] *Sling TV Terms of Use*, Sling TV (effective Jan. 24, 2018), https://www.sling.com/offer-details/disclaimers/terms-of-use ("Because charges are prepaid each billing period, when you call to cancel your Subscription Services, your subscription will continue, and you will be able to enjoy your Subscription Services through the end of, the then-current billing period . . . . Refunds are not issued for a partial billing period.").

55.     Even if the Act were ultimately found to be unenforceable, it would be impractical for Charter to recover prorated rebates paid out to former cable subscribers who no longer receive any Charter services, especially to locate and contact those who are no longer Charter subscribers.

56.     Likewise, even if Charter were to prevail in defending its policy in an enforcement action, it could not recover the operational costs associated with reversing its efforts to implement its whole-month billing policy in one of many franchise areas.

57.     Finally, even if Charter prevailed in its defense, it could not recover the lost customer goodwill from being labeled in violation of the Act.  Current subscribers are likely to question their choice of cable service provider if Charter is accused of violating the Act, and Charter may lose customers and goodwill as a result.

58.     The total value of declaratory and injunctive relief prohibiting enforcement of Section 1 of Maine Public Law Ch. 657 against Charter exceeds $75,000, including exposure to civil penalties, loss of goodwill, and the increased cost of compliance.

## FIRST CAUSE OF ACTION
### (Preemption – Proration Provision)

59.     Charter repeats and incorporates by reference the preceding paragraphs as though fully set forth herein.

60.     The Supremacy Clause of the U.S. Constitution provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

61.     Where a local law, regulation, or ordinance conflicts with federal law, federal law must be given preemptive effect.  Congress enacted the Cable Act to establish a national policy concerning cable communications, and the Cable Act reflects congressional intent to define the

limits of local authority to regulate cable systems and minimize unnecessary regulations that would impose an undue economic burden on those systems. 47 U.S.C. § 521. The Cable Act expressly forbids any regulation of rates of cable services except as provided for by the Cable Act. *Id.* § 543(a)(1), and specifically preempts state and franchising authorities from regulating the cable service rates of cable systems that the FCC has found to be subject to effective competition. *Id.* § 543(a)(2).

62.     The Cable Act further expressly preempts any state law, local law, or provision of a franchise granted by a franchising authority to the extent that it is inconsistent with the Cable Act. 47 U.S.C. § 556(c).

63.     The proration requirement in the Act regulates Charter's rates by dictating the structure of the rates that Charter can charge cable customers. Regulation of the increment of time charged for service—*e.g.*, per minute, per day, per month—is rate regulation. The proration requirement in the Act is therefore preempted by federal law.

64.     Federal courts have equitable authority to provide relief against ongoing violations of federal law. Of particular relevance here, a federal court may issue equitable relief against a state regulatory action upon finding the state regulatory action preempted. *See Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 642-44 (2002). Here, it is readily apparent that any threatened application of Section 1 of the Act is preempted by federal law.

65.     Charter has no adequate remedy at law for the harms it would incur if it was forced to comply with the Act. Forced proration in Maine would undercut Charter's ability to implement its national Terms and Conditions of Service and significantly disrupt Charter's back-office operations, and potentially encourage other franchising authorities to hale Charter into court in contravention of the Cable Act.

66.     Charter is accordingly entitled to equitable relief, including a declaratory judgment pursuant to 28 U.S.C. § 2201(a) and an injunction pursuant to 28 U.S.C. § 2202, to prevent these harms.

67.     Charter is also entitled under 42 U.S.C. § 1983 to an injunction preventing the Defendant from acting under the color of state law to enforce the proration requirement of the Act against Charter and to prevent interference with Charter's rights under federal law.

68.     Charter is accordingly entitled to equitable relief, including a permanent injunction, to prevent disobedience of the FCC's orders finding Charter subject to effective competition and prohibiting regulation of Charter's cable service rates.

**WHEREFORE**, Charter prays that this Court order appropriate relief, including, but not limited to, the following:

(a)     Enter a judgment under 28 U.S.C. §§ 2201(a) and 2202 declaring that the Act is preempted by the Cable Act and operation of the Supremacy Clause of the United States Constitution, and therefore is void and of no force or effect, to the extent that it purports to prevent Charter from charging monthly rates;

(b)     Enter a permanent injunction enjoining Defendant in his official capacities from acting under color of state or local law to take any action that would hold Charter liable for violations of the Act to the extent that it purports to prevent Charter from charging monthly rates in violation of the Cable Act or regulations or orders of the FCC;

(c)     Award Charter costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and

(d)     Award such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated: May 11, 2020

/s/ Joshua D. Dunlap
Joshua D. Dunlap
PIERCE ATWOOD LLP
Merrill's Wharf
254 Commercial Street
Portland, ME 04101
(207) 791-1100
jdunlap@pierceatwood.com

Howard J. Symons (*pro hac vice* pending)
Matthew S. Hellman (*pro hac vice* pending)
Jonathan A. Langlinais (*pro hac vice* pending)
JENNER & BLOCK LLP
1099 New York Avenue NW, Suite 900
Washington, DC 20001
(202) 639-6000
hysmons@jenner.com
mhellman@jenner.com
jlanglinais@jenner.com

*Counsel for Plaintiffs Spectrum Northeast, LLC
and Charter Communications, Inc.*

17