# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| SPECTRUM NORTHEAST, LLC,<br><br>    and<br><br>CHARTER COMMUNICATIONS, INC.,<br><br>                     Plaintiffs,<br><br>    vs.<br><br>AARON FREY, in his official capacity as Attorney General for the State of Maine,<br><br>                  Defendant. | Case No. _____<br><br><br>**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION INCORPORATING MEMORANDUM OF LAW IN SUPPORT** |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 3

I.      The Cable Act, Preemption, And Rate Regulation ................................................ 3

II.     Charter's Sale Of Cable Service On A Monthly Basis .......................................... 4

III.    The Act ................................................................................................................... 6

LEGAL STANDARD .......................................................................................................... 7

ARGUMENT ....................................................................................................................... 8

I.      Charter Is Likely To Succeed On The Merits Of Its Preemption Claim Because The Act Directly Regulates Charter's Rates For Cable Service. ................................. 8

        A.      Federal Law Expressly Preempts The Regulation Of Rates For Cable Services In Areas Where Charter Faces Effective Competition From Other Providers. ................................................................................................ 8

        B.      The Act Is Rate Regulation. ................................................................... 9

II.     Absent Preliminary Injunctive Relief, Charter Will Suffer Irreparable Harm ...... 12

III.    No Substantial Harm Will Result From Injunctive Relief. ................................... 18

IV.     The Public Interest Favors Injunctive Relief. ...................................................... 19

CONCLUSION .................................................................................................................... 20

i

# TABLE OF AUTHORITIES

CASES

*ACLU v. Ashcroft*, 322 F.3d 240 (3d Cir. 2003), *aff'd*, 542 U.S. 656 (2004)................................19

*Altice USA, Inc. v. New Jersey Board of Public Utilities*, No. 319CV21371BRMZNQ, 2020 WL 359398 (D.N.J. Jan. 22, 2020), *appeal docketed*, No. 20-1773 (3d Cir. Apr. 10, 2020) ............................................................................................................................2, 10, 17

*American Telephone & Telegraph Co. v. Central Office Telephone, Inc.*, 524 U.S. 214 (1998)........................................................................................................................................9

*Arizona v. United States*, 567 U.S. 387 (2012)................................................................................8

*City of New York v. FCC*, 486 U.S. 57 (1988)................................................................................8

*Condon v. Andino, Inc.*, 961 F. Supp. 323 (D. Me. 1997) ......................................................17, 19

*Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas*, 445 F.3d 13 (1st Cir. 2006) ..................7

*Gonzalez-Droz v. Gonzalez-Colon*, 573 F.3d 75 (1st Cir. 2009)....................................................7

*Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013) ......................................................................19

*K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907 (1st Cir. 1989) ............................................15

*Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558 (6th Cir. 1982)........................................13

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) ..................................................16, 17

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12 (1st Cir. 1996) ...................7, 12, 15

*Siembra Finca Carmen, LLC. v. Secretary of Department of Agriculture of Puerto Rico*, No. CV 18-1783, __ F. Supp. 3d __, 2020 WL 557208 (D.P.R. Feb. 4, 2020)......................18

*Storer Cable Communications v. City of Montgomery*, 806 F. Supp. 1518 (M.D. Ala. 1992) ........................................................................................................................................9

*Town of Windham v. LaPointe*, 308 A.2d 286 (Me. 1973)............................................................18

*Windstream Nebraska, Inc. v. Nebraska Public Service Commission*, No. CI-10-2399, 2011 WL 13359491 (Neb. Dist. Ct. June 9, 2011) ........................................................................10

## CONSTITUTIONAL PROVISIONS AND STATUTES

U.S. Const. art. VI, cl. 2 ...........................................................................................8

Me. Const. art. IV, pt. 3, § 16 ...................................................................................6

47 U.S.C. § 332(c)(3)..............................................................................................11

47 U.S.C. §§ 521 *et seq.*..........................................................................................3

47 U.S.C. § 521(1) ................................................................................................3, 8

47 U.S.C. § 521(3) ................................................................................................3, 8

47 U.S.C. § 521(6) ................................................................................................3, 8

47 U.S.C. § 543 .........................................................................................................3

47 U.S.C. § 543(a) ....................................................................................................3

47 U.S.C. § 543(a)(1)................................................................................................1

47 U.S.C. § 543(a)(2)......................................................................................1, 3, 8, 12

47 U.S.C. § 552(d)...................................................................................................12

47 U.S.C. § 556(c) ...........................................................................................1, 3, 8

Me. Rev. Stat. tit. 5 § 212 ........................................................................................7

Me. Rev. Stat. tit. 30-A § 3010(1) ..........................................................................18

Me. Rev. Stat. tit. 30-A, § 3010(7) ...........................................................................7

## ADMINISTRATIVE RULINGS

*In re Amendment to the Commission's Rules Concerning Effective Competition*, Report
    and Order, 30 FCC Rcd 6574 (2015)...........................................................4

*In re Comcast Cable Communications, LLC Time Warner Cable, Inc.*, Memorandum
    Opinion and Order, 23 FCC Rcd 6883 (2008)............................................4

*In re Communications Marketplace Report*, Report, 33 FCC Rcd 12558, 2018 WL 6839365
    (2018)...........................................................................................................4

*In re Implementation of Section 1004 of the Television Protection Act of 2019*, Order, MB
    Docket No. 20-61, DA 20-375 (MB rel. Apr. 3, 2020) .............................20

iii

*In re Southwestern Bell Mobile Systems, Inc.*, Memorandum Opinion and Order, 14 FCC Rcd 19898 (1999) ........................................................................................................11

*In re Time Warner Cable Inc.*, Memorandum Opinion and Order, 23 FCC Rcd 7131 (MB 2008) ................................................................................................................................4

*In re Time Warner Cable Inc.*, Memorandum Opinion and Order, 25 FCC Rcd 5438 (MB 2010) ................................................................................................................................4

*In re Time Warner Cable Inc. Time Warner Entertainment-Advance/Newhouse Partnership*, Memorandum Opinion and Order, 23 FCC Rcd 6559 (MB 2008)......................4

*In re Truth-In-Billing and Billing Format*, Second Report and Order, Declaratory Ruling, and Second Further Notice of Proposed Rulemaking, 20 FCC Rcd 6448 (2005), *vacated on other grounds*, *National Ass'n of State Utility Consumer Advocates v. FCC*, 457 F.3d 1238 (11th Cir. 2006) .......................................................................................11

**OTHER AUTHORITIES**

*Amazon Prime Terms* (last updated Dec. 27, 2018), https://www.amazon.com/gp/help/customer/display.html/ref=prime_pdp_prime_assist_terms?nodeId=13819201 ..........................16

*Amazon Prime Video Terms of Use*, Amazon.com (last updated Jan. 1, 2020), https://www.primevideo.com/help/ref=atv_hp_nd_cnt?nodeId=202095490.................................16

*AT&T TV Now Terms of Service and End User License Agreement*, AT&T (last visited Apr. 22, 2020), https://www.atttvnow.com/terms-and-conditions .........................................16

*DIRECTV Residential Customer Agreement*, AT&T (effective Dec. 20, 2019), https://www.att.com/legal/terms.dtv_residentialCustomerAgreement.html...........................16

A.E. Kahn, *The Economics of Regulation* (1993 ed.)................................................................9, 10

Maine State Legislative, http://legislature.maine.gov/ (last visited Apr. 22, 2020) ......................6

Merriam–Webster Online Dictionary, https://www.merriam-webster.com/dictionary/rate (last visited Apr. 22, 2020) ...............................................................................................9

*Netflix Terms of Use*, Netflix (last updated Apr. 24, 2019), https://help.netflix.com/legal/termsofuse ..........................................................................................................................16

Oxford English Dictionary Online, https://www.oed.com/view/Entry/158412 (last visited Apr. 22, 2020)..............................................................................................................9

*Residential Customer Agreement*, DISH (last updated Jan. 2020), https://www.dish.com/downloads/legal/residential-agreement.pdf ................................................................16

*Sling TV Terms of Use,* Sling TV (last updated Jan. 24, 2018), https://www.sling.com/offer-details/disclaimers/terms-of-use ............................................................................................16

*Terms of Use*, Hulu (effective Sept. 27, 2019), https://secure.hulu.com/terms ...........................16

v

## INTRODUCTION

Plaintiffs Spectrum Northeast, LLC ("Spectrum Northeast") and Charter Communications, Inc. ("CCI") (collectively, "Charter")[1] move for a preliminary injunction to enjoin enforcement of Maine Public Law Ch. 657 ("the Act"), which regulates Charter's rates for cable service. The Act is preempted by Title VI of the Communications Act of 1934 (the "Cable Act"), which gives the federal government the exclusive power to regulate the rates of cable providers. The Act, which goes into effect on June 16, 2020, will also inflict substantial and irreparable harm on Charter. Accordingly, the Court should enjoin enforcement of the Act pending final resolution of the case on the merits.

Under the Cable Act, no State may "regulate the rates" of cable providers in jurisdictions, like Maine, where the Federal Communications Commission ("FCC" or "Commission") has found that cable providers face effective competition from other video services. 47 U.S.C. § 543(a)(1)-(2); *see also id.* § 556(c). The Act is quintessential rate regulation because it requires Charter to modify its longstanding whole-month billing policy, under which it offers cable service to subscribers on a monthly basis and requires subscribers to pay in advance of the ensuing month's cable service. Consistent with this policy and Charter's Terms of Service, a subscriber who chooses to cancel service in the middle of the billing period will not receive a rebate, but may continue to receive service for the balance of the month if he or she so chooses.

Charter's rate policy reduces its administrative costs in numerous ways, leads to simple bills that are easier for subscribers to understand, and eases upward pressure on rates for continuing

---

[1] Charter Communications, Inc. ("CCI") through various subsidiaries, owns and operates cable systems and provides cable television, internet, and telephone services to residential, commercial, and governmental customers in 41 states. Spectrum Northeast, LLC ("Spectrum Northeast), a wholly-owned subsidiary of CCI, holds several franchises to provide cable service in Maine and is engaged in the business of providing cable, internet, and voice services in Maine.

subscribers. It also tracks the policy of many of Charter's most significant competitors (*e.g.*, DIRECTV, DISH, Sling TV, AT&T TV Now, Hulu + Live TV, Amazon Prime, and Netflix), who do not prorate and are not required to do so under Maine law. The Act requires Charter to abandon its whole-month billing policy in Maine and provide a pro-rata rebate to subscribers who cancel their service in the middle of the month.

Charter meets all the requirements for a preliminary injunction. First, Charter has a high likelihood of success on the merits. The Act is rate regulation and is therefore preempted. It mandates a particular rate structure and a specific unit of service that Charter must offer, *i.e.*, daily, rather than the monthly service Charter chooses to provide. Another federal court recently enjoined enforcement of a materially identical statewide proration requirement, finding it preempted by the Cable Act. *Altice USA, Inc. v. N.J. Bd. of Pub. Utils.*, No. 319CV21371BRMZNQ, 2020 WL 359398, at *8, *10 (D.N.J. Jan. 22, 2020) (granting preliminary injunction), *appeal docketed*, No. 20-1773 (3d Cir. Apr. 10, 2020).

Second, Charter will suffer irreparable harm absent injunctive relief. Complying with the terms of the Act and reversing whole-month billing in Maine would require CCI to reconfigure its billing systems and retrain customer service representatives—all at considerable time, effort, and expense. Changing Charter's Terms and Conditions now, and then likely again at the conclusion of this litigation, will also create customer confusion and result in the loss of goodwill and increased costs. And if Charter were to comply with the Act and issue rebates to subscribers while this litigation runs its course, Charter will have no feasible way to recoup the funds spent to prorate Maine subscribers' bills.

Finally, the balance of equities plainly favors relief. An injunction would not cause substantial harm to others, and the public interest favors injunctive relief. That is particularly so

because implementing the Act now would require Charter to divert resources away from meeting subscribers' needs during the current COVID-19 pandemic.

## BACKGROUND

### I.   The Cable Act, Preemption, And Rate Regulation

The Cable Act establishes the federal regulatory regime for cable operators, cable services, and cable systems.  *See* 47 U.S.C. §§ 521 *et seq.*  Congress enacted the Cable Act to "establish a national policy concerning cable communications," "establish guidelines for the exercise of Federal, State, and local authority with respect to the regulation of cable systems," and "promote competition in cable communications and minimize unnecessary regulation that would impose an undue economic burden on cable systems."  *Id.* § 521(1), (3), (6).  To effectuate these purposes and ensure the success of the federal regulatory scheme, Congress expressly preempted "any provision of law of any State, political subdivision, or agency thereof, or franchising authority, or any provision of any franchise granted by such authority, which is inconsistent with" the Communications Act of 1934, which includes the Cable Act.  *Id.* § 556(c).

Of particular relevance to this case, the Cable Act governs the circumstances under which a State or local franchising authority may regulate the rates of a cable service.  *See id.* § 543.  In this regard, Congress made clear that "No Federal agency or State may regulate the rates for the provision of cable service except to the extent provided under this section."  *Id.* § 543(a).  Congress then proceeded to define and circumscribe the scope of permissible rate regulation: "If the [Federal Communications] Commission finds that a cable system is subject to effective competition, the rates for the provision of cable service by such system *shall not be subject to regulation by the Commission or by a State*."  *Id.*  § 543(a)(2) (emphasis added).

3

Beginning in 2008, the FCC determined that Time Warner Cable (Spectrum Northeast's predecessor in interest) is subject to effective competition in 198 localities in Maine and revoked certification for those localities to regulate Time Warner Cable's cable service rates.[2]  The FCC subsequently adopted a rebuttable presumption that cable operators are subject to "effective competition" nationwide, *In re Amendment to the Commission's Rules Concerning Effective Competition*, Report and Order, 30 FCC Rcd 6574 (2015) (codified at 47 C.F.R. § 76.906) ("*2015 Report and Order*"), and neither the State nor any town in Maine has sought or received certification from the Commission to regulate rates for the provision of cable services since the issuance of the *2015 Report and Order*.[3]

## II.    Charter's Sale Of Cable Service On A Monthly Basis

Charter has long sold its cable services on a monthly basis and charged for those services in advance.  Subscriber bills clearly state the beginning and end date of the billing period, which does not vary month to month, so Charter's cable subscribers know in advance when their next billing period begins and thus can decide before the start of the billing period whether they wish to continue their cable service for an additional month.  Declaration of Matt Hellman ("Hellman Decl."), attached hereto as Exhibit A; Declaration of David Andreski ¶ 4 ("Andreski Decl."), attached hereto as Exhibit B.  Charter's Terms and Conditions have also long provided that a subscriber who cancels in the middle of the month will not receive a pro-rata rebate for the balance

---

[2] *See In re Time Warner Cable Inc. Time Warner Entertainment-Advance/Newhouse Partnership*, Memorandum Opinion and Order, 23 FCC Rcd 6559 (MB 2008); *In re Comcast Cable Communications, LLC Time Warner Cable, Inc.*, Memorandum Opinion and Order, 23 FCC Rcd 6883 (MB 2008); *In re Time Warner Cable Inc.*, Memorandum Opinion and Order, 23 FCC Rcd 7131 (MB 2008); *In re Time Warner Cable Inc.*, Memorandum Opinion and Order, 25 FCC Rcd 5438 (MB 2010).

[3] *See In re Communications Marketplace Report*, Report, 33 FCC Rcd 12558, 2018 WL 6839365, at *149 (2018) (Appendix B-1, Report on Cable Industry Prices ¶ 13) ("Thus far, only in Massachusetts and Hawaii have [local franchising authorities] successfully certified the lack of effective competition.").

of the month.  Specifically, Charter's Terms and Conditions notify subscribers that they "shall be responsible for the full monthly charge (without proration) for those Services that are offered on a monthly subscription basis to which the Subscriber has subscribed, regardless of Subscriber's termination of such monthly Service prior to the conclusion of the respective subscription month," to the extent consistent with applicable law.  Charter Terms and Conditions of Service ¶ 6, attached hereto as Exhibit C.

Effective June 23, 2019, after providing advance notice to its subscribers, Charter updated its rebate practice in Maine and elsewhere to conform to its Terms and Conditions.  Andreski Decl. ¶ 5.  To ensure that Maine subscribers are aware of this policy, Charter has since June 23, 2019 included a notice on its monthly subscriber bills and continues to do so.  *Id.* ¶ 10.  In order to implement this change, Charter updated its billing systems and modified its training manuals and operating procedures for customer service representatives who handle service change requests and billing inquiries.  *Id.* ¶.

Charter's decision to update its rebate practice was intended to address the operational challenges associated with accommodating prorated charges and credits and the desire to simplify and streamline its billing practices and reduce associated costs.  Prior to this update, even simple service changes could lead to highly complex and confusing bills.  Declaration of Renato Motta ¶ 10 ("Motta Decl."), attached hereto as Exhibit D.  Because subscribers were charged for a full month's service in advance, they would not see a credit for a given service change reflected on their bills until the month following the requested service change.  For example, if a subscriber were to cancel cable service but not broadband service on the 15th day of the billing cycle, he or she would not see the prorated credit until the following month.  This practice resulted in complicated bills and frequent customer confusion, as subscribers frequently called to inquire

about charges on their bills after a service change went into effect.  Andreski Decl. ¶ 6.  Increased interactions with customer service led to lower customer satisfaction and rising costs of responding to inquiries and training representatives to handle those billing-related inquiries.  *Id.*

In addition to the operational challenges associated with applying prorated credits and charges retroactively, Charter has long faced competition from providers like DIRECTV and DISH, neither of which is subject to cable regulation and neither of which provides a pro-rata rebate to terminating subscribers.  Andreski Decl. ¶ 8.  That competition has only become steeper with the entry of online video streaming services (*e.g.*, Sling TV, AT&T TV Now, Hulu + Live TV, Amazon Prime, and Netflix) that charge on a monthly basis without any prorated credits even if a subscriber cancels in the middle of a month, *id.*, and are likewise not subject to the Act. Prorating subscribers' cable bills put Charter at a disadvantage in several ways.  For instance, while Charter's proration practice was still in effect, Charter observed that some customers would subscribe to a premium channel or to one of Charter's streaming video services, only to cancel before the end of the first month and pay only a fraction of the monthly subscription rate.  *Id.* ¶ 9. Charter's non-cable competitors are not vulnerable to this type of consumer behavior because of their own whole-month billing practices.

## III.    The Act.

On March 17, 2020, the Maine Legislature passed Public Law Ch. 657.  The Act amends Section 3010 of Title 30-A of the Maine Revised Statutes, which governs non-exclusive franchises for cable television service, including the franchises held by Spectrum Northeast.  The Act was signed by the Governor on March 18, 2020, and by operation of law will become effective on June 16, 2020, Me. Const. art. IV, pt. 3, § 16; Maine State Legislature, http://legislature.maine.gov (last visited Apr. 22, 2020).  As a franchised cable operator in Maine, Spectrum Northeast is subject to

the Act.  Section 1 of the Act provides: "A franchisee shall grant a subscriber a pro rata credit or rebate for the days of the monthly billing period after the cancellation of service if that subscriber requests cancellation of service 3 or more working days before the end of the monthly billing period."  Maine Public Law Ch. 657, attached hereto as Exhibit E; *see also* Hellman Decl. ¶ 5.  Section 2 of the Act requires the cable operator to disclose to subscribers that they are entitled to the pro-rata refund required by Section 1.  *See* Ex. E.

Maine law provides for penalties in the event that a franchisee, such as Spectrum Northeast, does not comply with the Act.  A violation of any provision of Section 3010 is a violation of Maine's Unfair Trade Practices Act, Me. Rev. Stat. tit. 5 § 205-A *et seq*., which provides for civil enforcement, including penalties.  *See* Me. Rev. Stat. tit. 30-A, § 3010(7); Me. Rev. Stat. tit. 5 § 212.

## LEGAL STANDARD

In determining whether to issue a preliminary injunction, the court must weigh "(1) the likelihood of success on the merits; (2) the potential for irreparable harm to the movant if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest."  *Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006) (quotation marks and alteration omitted).  While the court has discretion to balance the relationship between these factors, *see Ross-Simons of Warwick, Inc. v. Baccarat, Inc*., 102 F.3d 12, 16 (1st Cir. 1996), the first two factors—success on the merits and irreparable harm—are the most important, *Gonzalez-Droz v. Gonzalez-Colon*, 573 F.3d 75, 79 (1st Cir. 2009).

7

## ARGUMENT

**I. Charter Is Likely To Succeed On The Merits Of Its Preemption Claim Because The Act Directly Regulates Charter's Rates For Cable Service.**

Charter is likely to succeed on its preemption claim because the Act's proration requirement is clearly a form of rate regulation. Defendant's intended enforcement of the Act would regulate Charter's rates by forcing Charter to charge for cable service on a daily basis rather than a monthly basis. The Cable Act prevents Maine from doing so because Charter has been found by the FCC to be subject to effective competition. 47 U.S.C. § 543(a)(2); *id*. § 556(c).

**A. Federal Law Expressly Preempts The Regulation Of Rates For Cable Services In Areas Where Charter Faces Effective Competition From Other Providers.**

The Supremacy Clause provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. Congress may expressly preempt state and local law, *see Arizona v. United States*, 567 U.S. 387, 399 (2012), and federal agencies may also act to preempt state and local laws that conflict with properly adopted federal regulations, *see City of New York v. FCC*, 486 U.S. 57, 64 (1988). Both types of preemption arise here.

Congress specifically preempted the regulation of rates for cable services in areas where the Commission found that cable service was subject to effective competition. 47 U.S.C. § 543(a)(2). Congress's decision to preempt regulation of cable rates serves Congress's stated goals of creating a "national policy" for cable communications and establishing guidelines for the exercise of regulation at all levels of government that promote competition and minimize unnecessary and burdensome regulation. *See id.* § 521(1), (3), (6). Were states and localities permitted to regulate rates outside of the FCC's prescription, the carefully constructed federal

regulatory scheme would be frustrated.  As discussed above, the FCC has found that Charter is subject to effective competition in Maine not once, but twice.  *See supra* at 2.

### B.        The Act Is Rate Regulation.

Charter is likely to prevail in proving that the enforcement of the Act would, in fact, constitute impermissible rate regulation.  The Act would regulate rates for the provision of cable services by requiring Charter to prorate the cost, *i.e.*, the rate charged, for its services in a subscriber's last month of service.

Because the Cable Act does not define "rate," the term should be given its ordinary, plain English meaning.  *See, e.g.*, *Storer Cable Commc'ns v. City of Montgomery*, 806 F. Supp. 1518, 1543 (M.D. Ala. 1992).  A "rate," as defined by the Oxford English Dictionary, is "[t]he amount of a charge or payment . . . [having relation] of some other amount or as a basis of calculation." Oxford English Dictionary Online, https://www.oed.com/view/Entry/158412 (last visited Apr. 22, 2020);  *see  also*  Merriam–Webster  Online  Dictionary,  https://www.merriam-webster.com/dictionary/rate (last visited Apr. 22, 2020) (defining a rate as "a charge per unit of a public-service commodity").

As these definitions make clear, a "rate" is not just the amount an entity can charge, but the charge for a specific amount of the item or service.  For example, $30 is not a rate; $30 *per month* is a rate.  A rate is the price charged for a particular quantity of service.  *See* A.E. Kahn, *The Economics of Regulation* at 21 (1993 ed.) ("[P]rice is a ratio, with money in the numerator and some physical unit of given or assumed quantity and quality in the denominator."); *accord Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214, 223 (1998) ("Rates, however, do not exist in isolation.  They have meaning only when one knows the services to which they are attached.").  In this case, the quantity of service is measured in time.

9

The Act's requirement for a cable provider to prorate a subscriber's bill is rate regulation because it forbids providers from offering their services on a monthly basis, rather than on a daily basis. Such a regulation dictates what rate (price/time combination) the provider can offer. This rate structure requirement is as much a part of rate regulation as the rate level. *See* Kahn at 25-26 (characterizing rate regulation as encompassing the "structure of rates" in addition to the "level of rates").

Both courts to have considered the question have held that proration requirements constitute rate regulation. In *Altice USA, Inc. v. New Jersey Board of Public Utilities*, the district court held that a materially identical proration requirement under New Jersey law "violates the Cable Act" and granted plaintiff's motion for a preliminary injunction. 2020 WL 359398, at *8, *10. The district court reasoned that "[a] requirement that service providers prorate bills is a type of rate regulation" that is preempted by the Cable Act because it required Altice to bill subscribers "based on the exact dates of service." *Id.* at *8.

Similarly, the district court in *Windstream Nebraska, Inc. v. Nebraska Public Service Commission* held that requiring telecommunications carriers to "cease charging the customer for services and equipment as of the date of termination" and "refund the pro rata portion of the month's charges for the period of days remaining in the billing period" was "rate regulation" under Nebraska law. No. CI-10-2399, 2011 WL 13359491, at *2-3, *6 (Neb. Dist. Ct. June 9, 2011). As in this case, Nebraska's regulation effectively required Windstream to "change its rate from a monthly fixed rate to a daily rate so that the rate can be prorated." *Id.* at *6. This amounted to an unauthorized "attempt[] to modify the amount of time that is covered by the amount of dollars charged by a carrier," and thereby "mandate[d] that the rate period for service be less than one month." *Id.*

10

These holdings comport with the FCC's own interpretation of what constitutes rate regulation. The FCC has long held that regulation of rate structure—including the unit of service that must be offered—is rate regulation. Like the Cable Act, the Communications Act prohibits state regulation of the rates for commercial mobile radio service ("CMRS"), *i.e.*, cell phone service. 47 U.S.C. § 332(c)(3). In applying this preemption provision, the FCC held that a state law that specifies the unit of service that a provider must offer its subscribers is rate regulation and therefore preempted. *See In re Southwestern Bell Mobile Systems, Inc.*, Memorandum Opinion and Order, 14 FCC Rcd 19898, 19908 ¶ 23 (1999) ("[P]rohibit[ing] CMRS providers from charging for incoming calls or charging in whole minute increments . . . would 'regulate . . . the rates charged by . . . [a] commercial mobile service . . . .'" (quoting *In re Comcast Cellular Telecomms. Litig.*, 949 F. Supp. 1193, 1201 (E.D. Pa. 1996)). More broadly, the Commission "has made clear that the proscription of state rate regulation extends to the regulation of 'rate levels' and 'rate structures' for CMRS." *In re Truth-In-Billing and Billing Format*, Second Report and Order, Declaratory Ruling, and Second Further Notice of Proposed Rulemaking, 20 FCC Rcd 6448, 6462-63 ¶ 30 (2005), *vacated on other grounds*, *Nat'l Ass'n of State Util. Consumer Advocates v. FCC*, 457 F.3d 1238 (11th Cir. 2006).

While these decisions arose in the CMRS context, their findings regarding what constitutes rate regulation are not limited to cellular service. The Commission's fundamental conclusion in S*outhwestern Bell* was that regulation of the unit of time for which a party can charge for a service—*e.g.*, minute, hour, month—is rate regulation. That principle is as valid in the context of regulating cable rates as it is in the context of regulating cellular rates. Indeed, the statute preempting state rate regulation that was at issue in *Southwestern Bell* is virtually identical in structure to the one here. *Compare* 47 U.S.C. § 332(c)(3) ("[N]o State or local government shall

11

have any authority to regulate the entry of or the rates charged by any commercial mobile service . . .”), *with id.* § 543(a)(2) (“If the Commission finds that a cable system is subject to effective competition, the rates for the provision of cable service by such system shall not be subject to regulation by the Commission or by a State or franchising authority under this section.”).  Maine’s prohibition on whole-month billing, like the state-imposed prohibition on whole-minute billing in *Southwestern Bell*, constitutes rate regulation and is therefore preempted.

Nor can the Act avoid preemption on the ground that Maine purportedly adopted it as a consumer protection measure.  Federal law permits a state to “enact[] or enforc[e] any consumer protection law, to the extent *not specifically preempted by this subchapter*.”  *Id.* § 552(d) (emphasis added).  But, as explained above, federal law specifically preempts state rate regulation where, as here, the cable system has been found by the FCC to be subject to effective competition throughout the State.  *Id.* § 543(a)(2).  Maine cannot engage in rate regulation by styling that regulation as a consumer protection initiative.

For the foregoing reasons, Charter is likely to succeed on its claim that Section 1 of the Act constitutes impermissible rate regulation that is preempted by the Cable Act.

## II.    Absent Preliminary Injunctive Relief, Charter Will Suffer Irreparable Harm.

This Court should grant a preliminary injunction because Charter will suffer irreparable harm if the Defendant is permitted to enforce the Act’s proration requirement against Charter.  A moving party has the burden of demonstrating that it will likely suffer irreparable harm absent injunctive relief.  “It is usually enough if the plaintiff shows that its legal remedies are inadequate” by showing that it will likely suffer “a substantial injury that is not accurately measurable or adequately compensable by money damages.”  *Ross-Simons of Warwick, Inc.*, 102 F.3d at 18-19.

If the Act is allowed to take effect on June 16, 2020 as planned, Charter will suffer at least five different kind of harms for which it has no adequate legal remedy.

*First*, in addition to undoing the benefits Charter sought by enforcing the whole-month billing policy in the first instance, it would cost CCI hundreds of thousands of dollars and at least six months updating its systems to implement a proration requirement for cable customers only. CCI would have no prospect of recovering these costs if the Act is ultimately held to be preempted. *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982) (recognizing that non-compensable costs resulting from compliance with an unconstitutional statute are irreparable harm). Charter does not have a specific billing system for Maine or a dedicated billing system for cable service. Motta Decl. ¶ 5. Implementing a proration requirement for cable customers only would therefore require significant modifications to the coding of CCI's billing system, especially with respect to the numerous subscribers who receive a bill for a bundle of services (*e.g.*, cable and internet access), given that the proration requirement only applies to charges for cable television service. *Id.* ¶¶ 5-6. Thus, the necessary changes would have to be made in the context of a multistate billing system that is not specifically dedicated to cable subscribers. *Id.* ¶ 5.

To add the billing system functionality necessary to apply prorated rebates to voluntary cancellations of cable service in Maine, CCI would need to contract with the vendor who owns the billing software to write new code for that purpose. *Id.* Acquiring that new code would cost between $300,000 and $400,000 and take between four to six months to complete. *Id.* ¶ 6. CCI would then have to spend at least two additional months and significant resources testing the new code and integrating it into Charter's system. *Id.* CCI would have to make similar modifications to the interfaces customer service representatives use to handle calls from subscribers. *Id.* ¶ 8. It would have to spend additional unrecoverable sums to reverse these efforts if it prevails in this

action.  In addition, during the period that the reconfiguring of the billing system was taking place, Charter would have to prorate customer bills manually, requiring substantial time and cost.  Motta Decl. ¶ 7.  None of these costs could be recouped in the event that Charter prevails on the merits of its claim.

Charter would also have to retrain its employees regarding the change in practices while the case is pending, only to retrain them once again if it were to prevail.  Charter has engaged in a months-long campaign to train its customer service representatives to explain and implement the whole-month billing policy, including how to respond to a range of potential subscriber scenarios that may arise as the policy is implemented.  CCI invested significant resources in this training, none of which it would be able to recoup if the policy were reversed or suspended.  Motta Decl. ¶ 9.  The interfaces currently used by CCI's customer service representatives would have to be updated to allow representatives to apply pro-rata rebates for Maine cable subscribers.  Implementing all of these changes would divert resources from maintaining and addressing other more urgent customer service and billing system issues.  *Id*.  Moreover, a relatively large number of customer service representatives would have to be retrained because Charter does not have Maine-specific customer service representatives.   Rather, CCI operates several regional call centers that handle incoming subscriber queries from across its entire national service footprint.  *Id.*

*Second*, once Charter pays out a rebate to a subscriber who discontinues service in the middle of a month, Charter would have no feasible way to recapture those rebates even if it ultimately prevailed in this case because it would be impractical to locate and contact those who no longer subscribe to any of Charter's services.  Andreski Decl. ¶ 15.

14

*Third*, Charter will likely suffer harm to its reputation and a loss of goodwill among its subscribers due to confusion about frequent changes to subscribers' bills. Under the whole-month billing policy, subscribers' bills are simple and relatively easy to understand. Motta Decl. ¶ 10. By contrast, when Charter was still providing pro-rata rebates, even simple service changes could lead to highly complex and confusing bills. *Id.* Implementing proration again will reintroduce these complications to subscribers' bills. *Id.* Furthermore, creating an *ad hoc* exception to Charter's whole-month billing policy for Maine subscribers—after implementing the policy change less than a year ago—is likely to confuse subscribers about Charter's rates and policies. *Id.* ¶ 10. That confusion will only double if the Court ultimately holds that the Act is preempted, allowing Charter to reinstate its whole-month billing policy at the end of these proceedings. This confusion will likely lead to an increase in the volume of calls to Charter's customer service representatives and a decrease in subscribers' overall satisfaction with Charter's cable service. *Id.* There is no precise way to assign a dollar-value to these harms. Indeed, the First Circuit has held that loss of goodwill and reputation "is the type of harm not readily measurable or fully compensable in damages." *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989); *see also Ross-Simons*, 102 F.3d at 20 ("By its very nature injury to goodwill and reputation is not easily measured or fully compensable in damages. Accordingly, this kind of harm is often held to be irreparable.").

*Fourth*, forcing Charter to prorate would put Charter at a competitive disadvantage in the market for video services. Many of Charter's competitors sell and charge for their services on a monthly basis, as Charter does, through one rate imposed on a monthly, advance basis, but without proration for mid-cycle cancellations. Andreski Decl. ¶ 14. For example, Charter competitors

15

DIRECTV,[4] DISH,[5] Sling TV,[6] AT&T TV Now,[7] Hulu + Live TV,[8] Amazon Prime,[9] and Netflix[10] all bill in advance of providing service and do not provide rebates or pro-rata credits when subscribers cancel their service during a billing cycle.  The Act does not apply to these competitors, and so they are immune from all of the costs of complying with it.  Imposing these costs on Charter will put upward pressure on its prices while exempting competitors from those same pressures. And the harms that will result from this competitive disadvantage are not readily measurable in monetary terms.

Fifth, and finally, being required to comply with a preempted law can itself be a form of irreparable harm.  In *Morales v. Trans World Airlines, Inc.*, the Supreme Court considered whether

[4] *DIRECTV Residential Customer Agreement*, AT&T (effective Dec. 20, 2019), https://www.att.com/legal/terms.dtv_ residentialCustomerAgreement.html ("Your cancellation is effective on the last day of the billing cycle in which you cancel (exceptions may apply to certain promotional periods and must be in writing) and you will not receive a prorated credit or refund for any portion of Service cancelled (subject to applicable law).").

[5] *Residential Customer Agreement*, DISH (last updated Jan. 2020), https://www.dish.com/downloads/legal/residen tial-agreement.pdf ("Prices, fees and charges, once charged to your account, are non-refundable, and no credits, refunds, price reductions or any other form of compensation will be provided in connection with the cancellation or disconnection of Services.").

[6] *Sling TV Terms of Use,* Sling TV (last updated Jan. 24, 2018), https://www.sling.com/offer-details/disclaimers/terms-of-use ("Because charges are prepaid each billing period, when you call to cancel your Subscription Services, your subscription will continue, and you will be able to enjoy your Subscription Services through the end of, the then-current billing period . . . . Refunds are not issued for a partial billing period.").

[7] *AT&T TV Now Terms of Service and End User License Agreement*, AT&T (last visited Apr. 22, 2020), https:// www.atttvnow.com/terms-and-conditions ("We do not provide refunds or credits for any partial-month periods or unwatched Content.").

[8] *Terms of Use*, Hulu (effective Sept. 27, 2019), https://hulu.com/terms ("Payments are not refundable.  If you cancel, modify your subscription, of if your account is otherwise terminated under these Terms, you will not receive a credit, including for partially used periods of Service.").

[9] *Amazon Prime Video Terms of Use*, Amazon.com (last updated Jan. 1, 2020), https://www.primevideo.com/ help/ref=atv_hp_nd_cnt?nodeId=202095490 ("If you cancel [outside the trial period], we will refund your full membership fee only if Digital Content available as part of your video-only membership has not been accessed through your account since your latest membership charge."); *see also Amazon Prime Terms*, Amazon.com (last updated Dec. 27, 2018), https://www.amazon.com/gp/help/customer/display.html/ref=prime_pdp_prime_assist_terms?node Id=13819201 (disallowing subscription fee refund unless the customer has not used Amazon Prime during the billing cycle).

[10] *Netflix Terms of Use*, Netflix (last updated Apr. 24, 2019), https://help.netflix.com/legal/termsofuse ("Payments are nonrefundable and there are no refunds or credits for partially used periods. Following any cancellation, however, you will continue to have access to the service through the end of your current billing period.").

the Federal Aviation Act preempted state guidelines concerning the content and format of airline advertising.  504 U.S. 374, 378 (1992).  The Court concluded that the plaintiff air carriers who were subject to the guidelines faced irreparable injury and that a preliminary injunction enjoining the guidelines was appropriate because the plaintiffs faced a "Hobson's choice." *Id.* at 381.  The plaintiffs could either "continually violate the [state] law and expose themselves to potentially huge liability; or violate the law at least once as a test case and suffer the injury of obeying the law during the pendency of the proceedings and any further review." *Id.*  Such a choice, the Court concluded, amounted to irreparable injury.  Courts in this jurisdiction have held the same.  *Condon v. Andino, Inc.*, 961 F. Supp. 323, 331 (D. Me. 1997) (holding that it would impose irreparable harm on the plaintiff to be forced to choose between "either complying with regulations that are unconstitutional or violating his Town's laws").

Charter faces an analogous "Hobson's choice" here:  If it were to proceed with its plan to charge a monthly rate (regardless of when a subscriber requests to terminate his or her service), it would face a high likelihood that the Defendant would initiate an enforcement proceeding, *cf. Morales*, 504 U.S. at 381; if Charter were to exempt Maine from its whole-month billing policy, Charter would suffer the injury of obeying a law that is likely unconstitutional and incurring substantial irreparable costs to carve out Maine subscribers from policy.

Accordingly, Charter has established that it would suffer irreparable injury absent a preliminary injunction.  Indeed, the district court in *Altice* found that a materially identical cable regulation would impose the very same types of harms on the plaintiff cable provider and that those harms were irreparable.  *Altice*, 2020 WL 359398, at *8-9.

III.    **No Substantial Harm Will Result From Injunctive Relief.**

Enjoining the Act would not cause substantial harm to others.  As discussed above, the Act is likely unconstitutional, and as such Maine has no legitimate interest in enforcing it.  *See Siembra Finca Carmen, LLC. v. Sec'y of Dep't of Agric. of Puerto Rico*, No. CV 18-1783, __ F. Supp. 3d __, 2020 WL 557208, at \*11 (D.P.R. Feb. 4, 2020) ("Just as a government has no interest in enforcing an unconstitutional law, the public interest is harmed by the enforcement of laws repugnant to the United States Constitution." (citing *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)).

Moreover, a preliminary injunction would not harm Charter's subscribers or the general public.  To the contrary, when Charter prorated cable bills in the past, the practice led to customer confusion when billing for service was not reflected until the bill in the month following a service change.  The new policy minimizes such confusion.  *See supra.*  Furthermore, Charter adopted its whole-month billing policy less than a year ago.  If the Act were allowed to take effect in June, only to be found to be preempted at the end of this case, Charter's Maine subscribers would have to endure a confusing and disruptive round of policy changes in the meantime.  Andreski Decl. ¶ 13.  To prevent this whiplash, the more sensible approach is to allow Charter to maintain its current whole-month billing policy during these proceedings.[11]  Charter also expects enforcement

---

[11] Because the proration requirement of the Act should be enjoined, the Act's companion provision requiring cable operators to disclose to consumers that they are entitled to proration should also be enjoined.  That provision cannot be enforced (and would be affirmatively misleading) to the extent the proration requirement is preempted.  *Town of Windham v. LaPointe*, 308 A.2d 286, 293 (Me. 1973) (related provisions not severable where unlawful provision is an "essential" part of enactment).  Charter will continue to comply with all other required notices for service interruptions currently provided for in Me. Rev. Stat. tit. 30-A § 3010(1).

of this policy to reduce its transaction and back-office costs and thereby ease upward pressure on rates for existing and future subscribers.  Andreski Decl. ¶ 11; *see supra*.

## IV.  The Public Interest Favors Injunctive Relief.

Finally, a preliminary injunction is warranted because an injunction would further the public interest.  As this court has stated: "It is hard to conceive of a situation where the public interest would be served by enforcement of an unconstitutional law or regulation."  *Condon*, 961 F. Supp. at 331; *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[E]nforcement of an unconstitutional law is always contrary to the public interest."); *ACLU v. Ashcroft*, 322 F.3d 240, 251 n.11 (3d Cir. 2003) ("[N]either the Government nor the public generally can claim an interest in the enforcement of an unconstitutional law." (quotation marks omitted)), *aff'd*, 542 U.S. 656 (2004).  Because enforcement of the Act is likely preempted by federal law, the Court should find that a preliminary injunction is in the public interest.

The public interest particularly favors the entry of interim relief given that Charter has seen unprecedented demand for its services due to the global COVID-19 pandemic.  Millions of subscribers, including tens of thousands of Mainers, are now entirely dependent on their home networks for their jobs and education.  Andreski Decl. ¶ 12.   Requiring CCI to begin modifying its billing systems and retrain customer service representatives to comply with the Act will divert attention and resources from ensuring continuity of service during the current crisis.  These measures would be particularly onerous now given that Charter's teams are facing unprecedented workloads and dedicating nearly all of their capacity to handling a surge in customer calls due to the COVID-19 pandemic.  *See* Motta Decl. ¶ 12.

The FCC itself recently recognized the role that multichannel video programming distribution providers, including cable operators, are providing "to keep Americans informed and

19

connected during this national emergency" and it has delayed imposing "new billing requirements" that would "requir[e] providers to divert resources away from other consumer demands brought on by the pandemic." *See In re Implementation of Section 1004 of the Television Protection Act of 2019*, Order, MB Docket No. 20-61, DA 20-375 ¶¶ 1, 3 (MB rel. Apr. 3, 2020). The FCC there specifically found that ensuring continuity of service should take precedence over making "changes to existing billing systems [and] provide employee training" associated with the new rules. *Id.* ¶ 3. Modifying Charter's billing practices now would place a strain on the resources of CCI's technical, legal, and customer service personnel, who are already extremely overburdened during this time of crisis. Andreski Decl. ¶ 12. Rather than require Charter to divert resources now to implement the Act during the pendency of this litigation, this Court should issue an injunction preserving the status quo, so that Charter can focus its full attention on maintaining continuity of service so that Americans can remain connected to work, school, and one another, and get the information they need to stay safe.

## CONCLUSION

For the foregoing reasons, the Court should grant Charter's motion for a preliminary injunction and enjoin the Defendant from enforcing Maine Public Law Ch. 657.

Respectfully submitted,

Dated: May 11, 2020

/s/ Joshua D. Dunlap
Joshua D. Dunlap
PIERCE ATWOOD LLP
Merrill's Wharf
254 Commercial Street
Portland, ME 04101
(207) 791-1100
jdunlap@pierceatwood.com

20

Howard J. Symons (*pro hac vice* pending)
Matthew S. Hellman (*pro hac vice* pending)
Jonathan A. Langlinais (*pro hac vice* pending)
JENNER & BLOCK LLP
1099 New York Avenue NW, Suite 900
Washington, DC 20001
(202) 639-6000
hysmons@jenner.com
mhellman@jenner.com
jlanglinais@jenner.com

*Counsel for Plaintiffs Spectrum Northeast, LLC
and Charter Communications, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on May 11, 2019, I electronically filed the foregoing document entitled

Motion for Preliminary Injunction Incorporating Memorandum of Law in Support via email to the

U.S. District Court, Bangor, Maine (newcases.bangor@med.uscourts.gov), and sent a copy of the

foregoing document to the State Attorney General's Office by email

(Christopher.C.Taub@maine.gov) and U.S. Mail at the following address (on May 12, 2020):

Christopher C. Taub
Office of the Maine Attorney General
109 Sewall Street
Augusta, ME 04330

Respectfully submitted,

Dated: May 11, 2020

/s/ Joshua D. Dunlap
Joshua D. Dunlap
PIERCE ATWOOD LLP
Merrill's Wharf
254 Commercial Street
Portland, ME 04101
(207) 791-1100
jdunlap@pierceatwood.com

*Counsel for Plaintiffs Spectrum Northeast, LLC
and Charter Communications, Inc.*