# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| SPECTRUM NORTHEAST LLC, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) 1:20-cv-00168-JDL |
| | ) |
| AARON FREY, in his official | ) |
| Capacity as Attorney General of | ) |
| the State of Maine, | ) |
| | ) |
| Defendant. | ) |

## ORDER ON MOTION TO DISMISS

On March 18, 2020, the Maine Legislature enacted Public Law 2020, ch. 657, "An Act To Require a Cable System Operator To Provide a Pro Rata Credit When Service Is Cancelled by a Subscriber" (the "Pro Rata Law"). Spectrum Northeast, LLC, and Charter Communications, Inc. (collectively, "Charter"), assert in their complaint filed May 11, 2020 that the Pro Rata Law is preempted by federal law and seek a declaratory judgment and an injunction prohibiting Maine Attorney General Aaron Frey from enforcing the law against them (ECF No. 1). The Attorney General contends that the Pro Rata Law is not preempted and moves to dismiss Charter's complaint (ECF No. 12). A hearing on the motion to dismiss was held on July 21, 2020. For the reasons explained below, I deny the motion.

### I. FACTUAL BACKGROUND

The complaint alleges the following facts, which I treat as true on a motion to dismiss. Spectrum Northeast, LLC, is a franchised cable operator that provides cable television, internet, and telephone services to customers in Maine. Charter

1

Communications, Inc., is the parent company of Spectrum Northeast and provides certain billing and other services to Spectrum Northeast in support of its provision of cable service. Charter offers cable service to subscribers for a fixed dollar amount on a monthly basis and requires subscribers to pay in advance for the ensuing month's cable service. This is known as a "whole-month billing" policy. Consistent with this policy and with Charter's Terms of Service, a subscriber who chooses to cancel service in the middle of the billing period does not receive a rebate, but may continue to receive service for the balance of the month if he or she so elects.

On March 18, 2020, Maine's Pro Rata Law was enacted. *See* P.L. 2020, ch. 657. Section 1 of the Pro Rata Law provides that when a cable subscriber cancels her cable service more than three working days before the end of a monthly billing period, her cable provider must grant her "a pro rata credit or rebate for the days of the monthly billing period after the cancellation of service." P.L. 2020, ch. 657, § 1 (to be codified at 30-A M.R.S.A. § 3010(1-A)). Section 2 of the Pro Rata Law requires that cable providers notify consumers of the right to proration as set forth in section 1. *Id.* § 2 (to be codified at 30-A M.R.S.A. § 3010(2-A)). Charter's whole-month billing policy does not provide for pro rata credits or rebates and is therefore incompatible with the Pro Rata Law.[1]

## II. LEGAL STANDARD

To survive a motion to dismiss, the complaint "must contain sufficient factual matter to state a claim to relief that is plausible on its face." *Rodríguez-Reyes v.*

---

[1] The Attorney General agreed to postpone enforcement of the Pro Rata Law pending resolution of the motion to dismiss and Charter's motion for a preliminary injunction (ECF No. 4). ECF No. 16.

*Molina-Rodríguez*, 711 F.3d 49, 53 (1st Cir. 2013) (quoting *Grajales v. P.R. Ports Auth.*, 682 F.3d 40, 44 (1st Cir. 2012)). Courts apply a "two-pronged approach" to resolve a motion to dismiss. *Ocasio-Hernandez v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011). First, the court must identify and disregard statements in the complaint that merely offer legal conclusions couched as factual allegations. *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Second, the court "must determine whether the remaining factual content allows a reasonable inference that the defendant is liable for the misconduct alleged." *A.G. ex rel. Maddox v. Elsevier, Inc.*, 732 F.3d 77, 80 (1st Cir. 2013) (quotation marks omitted). The court must accept all well-pleaded facts as true and draw all reasonable inferences in the plaintiff's favor. *Rodríguez-Reyes*, 711 F.3d at 52-53. Determining the plausibility of a claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 53 (quoting *Iqbal*, 556 U.S. at 679).

### III. DISCUSSION

Charter's complaint asserts that Maine's Pro Rata Law is preempted by the Cable Communications Policy Act of 1984, 47 U.S.C.A. §§ 521-573 (West 2020) (the "Cable Act"). The Attorney General contends that Charter's complaint does not state a plausible claim for relief because Maine's Pro Rata Law is not preempted by the Cable Act. Any preemption inquiry begins with the Supremacy Clause of the United States Constitution, which "mandates that federal law is the 'supreme Law of the Land.'" *Tobin v. Fed. Exp. Corp.*, 775 F.3d 448, 452 (1st Cir. 2014) (quoting U.S. Const. art. VI, cl. 2). Under the Supremacy Clause, "[a]ny state law that contravenes a federal law is null and void." *Id.* (citing *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1,

210-11 (1824), and *Brown v. United Airlines, Inc.*, 720 F.3d 60, 63 (1st Cir. 2013)). "Preemption may be express or implied." *Id.* (citing *Brown*, 720 F.3d at 63). "Express preemption occurs when congressional intent to preempt state law is made explicit in the language of a federal statute." *Id.* (citing *Grant's Dairy-Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res.*, 232 F.3d 8, 15 (1st Cir. 2000)).

The Cable Act contains two express preemption provisions relevant here. Title 47 U.S.C.A. § 556(c) states that "any provision of law of any State . . . which is inconsistent with this chapter shall be deemed to be preempted and superseded." Additionally, 47 U.S.C.A. § 543(a)(2) provides that "rates for the provision of cable service . . . shall not be subject to regulation . . . by a State," so long as the Federal Communications Commission ("FCC") has found that the cable system providing the service is subject to effective competition. In 2015, the FCC promulgated a regulation presuming that all cable systems are subject to effective competition. 47 C.F.R. § 76.906 (West 2020). It is undisputed that, pursuant to this regulation, the FCC has found that Charter is subject to effective competition in Maine. Thus, under § 543(a)(2) of the Cable Act, Maine may not regulate the rates that Charter charges for the provision of cable service. Accordingly, under § 556(c), any Maine statute that attempts to regulate rates for the provision of cable service is preempted by the Cable Act.

The parties dispute whether Maine's Pro Rata Law falls within the scope of the Cable Act's express preemption provisions. Specifically, they dispute whether the Pro Rata Law regulates "rates for the provision of cable service" within the meaning

4

of § 543(a)(2) of the Cable Act. I begin by explaining the legal standards that guide my analysis of the parties' arguments.

## A. Standards Governing the Analysis of Express Preemption Provisions

"Congressional intent is the touchstone of any effort to map the boundaries of an express preemption provision." *Tobin*, 775 F.3d at 452 (citing *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992), and *Grant's Dairy-Me.*, 232 F.3d at 14). To determine Congress's intent, a court must begin "with the text and context of the provision itself." *Id.* at 452-53 (citing *Mass. Ass'n of Health Maint. Orgs. v. Ruthardt*, 194 F.3d 176, 179-80 (1st Cir. 1999)). The inquiry into congressional intent is also "informed by the statutory structure, purpose, and history." *Id.* at 453 (citing *Brown*, 720 F.3d at 63, and *DiFiore v. Am. Airlines, Inc.*, 646 F.3d 81, 86 (1st Cir. 2011)). However, the text remains "the best evidence" of congressional intent. *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 136 S. Ct. 1938, 1946 (2016) (quoting *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 594 (2011)). Accordingly, where the text is sufficiently clear, the analysis begins and ends there. *See id.*

Additionally, when Congress has "legislated in a field traditionally occupied by the States," such as consumer protection, courts apply a presumption against preemption. *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)); *see also N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654-55 (1995) (collecting authorities). Accordingly, if an express preemption clause "is susceptible of more than one plausible reading" after an analysis of the statutory text, context, and purpose,

"courts ordinarily 'accept the reading that disfavors pre-emption.'"[2] *Altria Grp.*, 555 U.S. at 77, 80 (quoting *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005)); *see also Coventry Health Care of Mo., Inc. v. Nevils*, 137 S. Ct. 1190, 1197-98 & n.3 (2017) (indicating that the presumption against preemption does not apply where Congress's intent is apparent from the statutory text, context, and purpose); *CSX Transp., Inc. v. Healey*, 861 F.3d 276, 286 (1st Cir. 2017) (same). The presumption against preemption applies not only when determining whether Congress generally intended to preempt state law but also when delineating the scope of an express preemption provision.[3] *See Medtronic*, 518 U.S. at 485; *accord Brown*, 720 F.3d at 63 (citing *Medtronic*, 518 U.S. at 484, and *Ruthardt*, 194 F.3d at 179).

## B. Maine's Pro Rata Law and the Cable Act's Express Preemption Provisions

As noted above, § 543(a)(2) of the Cable Act provides, in pertinent part, that "rates for the provision of cable service . . . shall not be subject to regulation . . . by a State," and § 556(c) provides that "any provision of law of any State . . . which is inconsistent with this chapter shall be deemed to be preempted and suspended." The Attorney General contends that Maine's Pro Rata Law is not preempted for three reasons. First, he argues that the Pro Rata Law does not regulate any "rates" charged by Charter. Second, even if the Pro Rata Law regulates rates charged by Charter, he asserts that it does not regulate rates "for the provision of cable service." Finally, he

---

[2] Because I conclude that the Pro Rata Law is unambiguously preempted by the Cable Act, I need not and, therefore, do not address Charter's arguments questioning the continuing vitality of the presumption against preemption.

[3] Consistent with this framework, § 552(d)(1) of the Cable Act specifically permits states to enact and enforce consumer protection laws, so long as they are not "specifically preempted" by the Cable Act's other provisions.

6

contends that the Pro Rata Law does not fall within the scope of the Cable Act's preemption of state-imposed rate regulations because it is a consumer protection and customer service law permitted by § 552(d). I address each argument in turn.

### 1.     "Rate[] . . . Regulation"

The Cable Act does not explicitly define the word "rate" or the phrase "rate regulation." Accordingly, I assume that these words carry their plain and ordinary meaning. *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020). As relevant here, the Oxford English Dictionary defines "rate" as "[a] fixed charge or payment applicable to each individual instance of a set of similar cases" or "the amount paid or asked for a certain quantity of a particular commodity, service, etc." *Rate*, Oxford English Dictionary Online, https://www.oed.com/view/Entry/158412?rskey=6N3pIG&result=2&isAdvanced=false#eid (last visited Oct. 6, 2020); *see also Me. Pooled Disability Tr. v. Hamilton*, 927 F.3d 52, 57 (1st Cir. 2019) (using dictionary definitions to illuminate the "ordinary meaning" of statutory language). Similarly, Merriam-Webster defines "rate" as "a charge, payment, or price fixed according to a ratio, scale, or standard," such as "a charge per unit of a public-service commodity." *Rate*, Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/rate (last visited Oct. 6, 2020). Consistent with these definitions, Black's Law Dictionary defines "rate" as a "[p]roportional or relative value; the proportion by which quantity or value is adjusted," or as "[a]n amount paid or charged for a good or service." *Rate*, Black's Law Dictionary (11th ed. 2019). All three dictionary definitions indicate that the word "rate" refers to the price charged for a particular quantity of a product or service.

Charter alleges that, under its whole-month billing policy, it charges subscribers a specific price per month for cable service. In other words, Charter asserts that it provides cable service at a monthly, not daily, rate. If a subscriber cancels her cable service in the middle of a monthly billing period, she does not receive a credit, rebate, or other form of refund for the rest of that billing period. Thus, Charter's alleged whole-month billing policy effectively charges a higher daily rate to subscribers who cancel their service mid-month than to subscribers who do not cancel, because Charter sells cable service in monthly increments. Maine's Pro Rata Law prohibits this outcome. Under the Pro Rata Law, if a subscriber cancels her cable service in the middle of a monthly billing period, her cable provider must grant her "a pro rata credit or rebate for the days of the monthly billing period after the cancellation of service." P.L. 2020, ch. 657, § 1. The Pro Rata Law therefore alters the rates that Charter charges, at least for the subset of subscribers who cancel their service in the middle of any given month.

The Attorney General points out that the Pro Rata Law does not require Charter to adopt a fixed daily rate. However, the Pro Rata Law does require Charter to calculate rebates based on the number of days remaining in the monthly billing period after cancellation—or, as the Attorney General puts it, "on a daily basis." ECF No. 21 at 3 n.4. Thus, in order to comply with the Pro Rata Law, Charter must measure the quantity of service it provides in daily increments, rather than monthly increments. Further, under the Pro Rata Law, Charter must grant post-cancellation rebates or credits to ensure that subscribers who cancel their service in the middle of a monthly billing period are charged the same daily rate as subscribers who do not

8

cancel. In other words, the Pro Rata Law forces Charter to depart from its usual monthly rate in order to ensure that all subscribers are charged the same daily rate during any given billing cycle.[4] Thus, Charter's complaint sufficiently alleges that the Pro Rata Law regulates Charter's "rates," as that term is used in § 543(a)(2) of the Cable Act.[5] The only other court that has considered a similar law reached the same conclusion. *See Altice USA, Inc. v. N.J. Bd. of Pub. Utils.*, No. 3:19-cv-21371-BRM-ZNQ, 2020 WL 359398, at *8 (D.N.J. Jan. 22, 2020) ("A requirement that service providers prorate bills is a type of rate regulation.").[6]

### 2. "Rates for the Provision of Cable Service"

The Attorney General contends that even if Maine's Pro Rata Law regulates rates, it does not regulate rates "for the provision of cable service" under § 543(a)(2) of the Cable Act because the Pro Rata Law only regulates Charter's rates after service is terminated—that is, the rates for service that is never provided. To support this argument, the Attorney General relies on *Cable Television Ass'n of N.Y., Inc. v. Finneran*, 954 F.2d 91 (2d Cir. 1992). In that case, the court considered a state law

---

[4] The Attorney General puts this point differently, arguing that the Pro Rata Law simply requires Charter to maintain the ratio between the amount charged and the quantity of service provided by requiring subscribers who cancel mid-month to pay only for the percentage of the month during which they received service. However, this percentage is calculated on a daily basis, as mentioned above; the Pro Rata Law prohibits Charter from calculating its "rates" by the monthly increment it has chosen. *See, e.g.*, *Rate*, Oxford English Dictionary Online ("[a] fixed charge or payment applicable to each individual instance of a set of similar cases"). Thus, the Attorney General's argument only reinforces the conclusion that the Pro Rata Law is a rate regulation within the meaning of § 543(a)(2).

[5] Because I conclude that the Pro Rata Law plainly regulates Charter's rates, I need not address Charter's related argument that the Pro Rata Law regulates its "rate structure."

[6] The Attorney General contends that *Altice* "should not be read as an endorsement of Charter's position" because the defendants in that case did not brief the merits of the preemption issue. ECF No. 12 at 11. This point is well taken, but it does not substantively undermine the court's logic in *Altice*. Accordingly, I treat the court's decision in *Altice* as supportive authority and rely on it only for the limited proposition for which it is cited.

prohibiting certain "downgrade fees" imposed upon subscribers who wished to move from a more expensive tier of channels to a lower, cheaper tier of cable service. *Id.* at 93. The court held that the state's prohibition on downgrade fees did not regulate rates "for the provision of services" under § 543(a)(2) because it is "linguistically unlikely . . . that the customer is 'provided' with cable service when services . . . are removed." *Id.* at 99. Further, the court found that prohibiting downgrade fees was consistent with the Cable Act's purpose of "allow[ing] market forces to control the rates charged by cable companies" because downgrade fees "insulate cable companies from market forces." *Id.* at 100. Thus, the court concluded that the Cable Act did not preempt the state's prohibition on downgrade fees. *See id.*

However, as Charter asserts, *Finneran* is distinguishable. The downgrade fees at issue in *Finneran* were akin to deinstallation fees, charged in addition to the cable provider's monthly rates for the provision of cable service. *See id.* at 93. Because the downgrade fees and the rates for the ongoing provision of cable service were independent, the state's prohibition on downgrade fees did not directly regulate the rates charged by the cable provider at any time, whether before or after the downgrade request was made. *See id.* at 98-100. Unlike the state law at issue in *Finneran*, Maine's Pro Rata Law does not regulate a one-time cancellation or deinstallation fee but operates directly on the rate that Charter may charge for providing a certain quantity of cable service before a customer cancels service, as discussed above. Although the Pro Rata Law applies only to the month in which a subscriber cancels her cable service, its prohibition on charges for service that was not provided have the effect of prescribing a daily rate for the service that was

provided before the cancellation. Thus, the complaint states a claim that the Pro Rata Law regulates the rates that Charter charges "for the provision of cable service" under § 543(a)(2).

### 3.   "Consumer Protection" and "Customer Service"

The Attorney General contends that the scope of § 543(a)(2)'s prohibition on rate regulation is narrower than its plain language suggests when it is read in the context of the Cable Act as a whole. Because paragraphs 552(d)(1) and (2) of the Cable Act expressly permit states to enact "consumer protection" and "customer service" laws, the Attorney General argues, § 543(a)(2) was not intended to preempt state laws relating to consumer protection or customer service. I address his arguments under each statutory provision in turn.

#### a.   "Consumer Protection"

First, the Attorney General contends that Maine's Pro Rata Law is a consumer protection law and that, as such, it does not fall within the intended scope of § 543(a)(2)'s prohibition on rate regulation. The Attorney General points out that § 552(d)(1) of the Cable Act expressly permits states to enact and enforce certain "consumer protection law[s]." However, the entire text of § 552(d)(1) provides that states may enact and enforce "any consumer protection law, *to the extent not specifically preempted*" by other provisions of the Cable Act. *Id.* (emphasis added). Thus, describing the Pro Rata Law as a consumer protection law does not aid in determining whether the Pro Rata Law is preempted by § 543(a)(2)—it simply begs the question. Because I find that Charter has sufficiently stated a claim that the Pro

Rata Law regulates Charter's rates, and is therefore "specifically preempted" by § 543(a)(2), § 552(d)(1) does not change the result.

### b. "Customer Service"

Second, the Attorney General argues that Maine's Pro Rata Law is a "law[] concerning customer service" within the meaning of § 552(d)(2) and that, as such, it is not preempted by § 543(a)(2). Section 552(d)(2) provides that "[n]othing in [the Cable Act] shall be construed to prevent the establishment or enforcement of . . . any State law[] concerning customer service," so long as the state law either "imposes customer service requirements that exceed the standards set by the [FCC]" pursuant to § 552(b) or "addresses matters not addressed" by those standards. Because § 552(d)(2) does not include the same preemption clause that appears in § 552(d)(1), it is conceivable that a law could be valid under § 552(d)(2) even if it constitutes rate regulation for purposes of § 543(a)(2).[7]

The problem is that the Pro Rata Law cannot be characterized as a "law concerning customer service" for purposes of § 552(d)(2) because it does not "impose[] customer service requirements" on cable operators. Section 552(b) indicates that "customer service requirements . . . include, at a minimum, requirements governing (1) cable system office hours and telephone availability; (2) installations, outages, and service calls; and (3) communications between the cable operator and the subscriber (including standards governing bills and refunds)." The only one of these requirements that might plausibly allow a state to impose a proration requirement is

---

[7] Because, as described below, I find that the Pro Rata Law is not a "law concerning customer service" under § 552(d)(2), I do not address the scope of any potential conflict between these two sections.

paragraph 552(b)(3), which addresses "communications between the cable operator and the subscriber (including standards governing bills and refunds)."  Although paragraph 552(b)(3) includes the phrase, "standards governing bills and refunds," it uses the phrase only as a parenthetical modifier of the primary term, "communications between the cable operator and the subscriber."  *Id.*  Thus, when read in context, § 552(b)(3) is limited to customer service requirements governing communications implicating bills and refunds, such as the time within which operators must issue refunds.  *See* 47 C.F.R. 76.309(c)(3) (2020).  It does not suggest that requirements governing the availability or structure of refunds qualify as "customer service requirements."[8]

Of course, as the Attorney General contends, the meaning of "customer service requirements" is not limited by the examples set forth in §§ 552(b)(1)-(3).  Indeed, the phrase "at a minimum" in § 552(b) makes it plain that those examples are non-exhaustive.  In the absence of further guidance from the statute, I assume that the phrase "customer service requirements" carries its plain and ordinary meaning.  *City of Providence*, 954 F.3d at 31 (citing *Stornawaye Fin. Corp.*, 562 F.3d at 32).  The Oxford English Dictionary defines "customer service" as "assistance and advice provided by a company to those people who buy or use its products or services."  *Customer service*, Oxford English Dictionary Online,

---

[8] The regulations promulgated by the FCC pursuant to § 552(b)(3) support this view.  In a subsection entitled "Communications between cable operators and cable subscribers," the FCC regulations prescribe the time within which cable operators must issue refund checks and credits for service.  *See* 47 C.F.R. § 76.309(c)(3) (2020).  Similarly, in a related context, the FCC has stated that customer service obligations under § 552 "are regulatory standards that govern how cable operators are available to and communicate with customers."  Local Franchising Authorities' Regulation of Cable Operators and Cable Television Services, 84 Fed. Reg. 44725, 44737 (Aug. 27, 2019).

https://www.oed.com/view/Entry/46319?redirectedFrom=%22customer+service%22#eid1212284660 (last visited Oct. 6, 2020). Under this definition, a state law requiring cable operators to provide certain forms of assistance or advice to subscribers would "impose[] customer service requirements" and therefore would fall within the scope of § 552(d)(2). It is possible that some laws requiring cable operators to grant credits, rebates, or refunds might meet this definition.

Further, as the Attorney General points out, the legislative history of the Cable Act supports the view that "customer service requirements" may encompass some requirements that cable operators provide rebates and credits to subscribers. Specifically, a House Report recommending the passage of the Cable Act defines "customer service requirements" as including "requirements related to . . . disconnection" of cable service as well as requirements related to "rebates and credits to consumers." H. Rep. 98-934, at 79 (1984). Because the Pro Rata Law imposes requirements related to rebates and credits upon disconnection, the Attorney General argues that it is a customer service law permitted by § 552(d)(2).

The Attorney General might prevail on this argument if the Pro Rata Law regulated cancellation fees charged in addition to Charter's ordinary rates, *see Finneran*, 954 F.2d at 1010, or if it imposed mandatory rebates and credits in a manner that did not control the rates that Charter charges for cable service, such as when subscribers are accidentally overcharged or experience a lengthy service interruption. *Cf.* 30-A M.R.S.A. § 3010(1)(A) (West 2020) (requiring a cable operator to issue a pro rata credit or rebate for a service interruption of more than six hours). However, the Pro Rata Law goes well beyond these examples and directly regulates

the rates that Charter may charge subscribers who cancel in the middle of a monthly billing period, as discussed above. Although the Pro Rata Law's method of regulation—a mandatory rebate—may be contemplated or authorized by § 552(d)(2), the substance that the Pro Rata Law regulates—the increment by which a cable operator must bill for cable service—is unambiguously prohibited by § 543(a)(2), and nothing in the statutory text or legislative history of § 552(d)(2) suggests that it creates an exception to that prohibition. *See Finneran*, 954 F.2d at 101-02 (suggesting that state laws are only permitted by § 552 if they are not "rate regulations" within the meaning of § 543(a)(2)); H. Rep. 98-934 at 79.

Furthermore, the Attorney General's interpretation is at odds with the overarching purposes of the Cable Act, which was intended to "establish a national policy concerning cable communications" and to "establish guidelines for the exercise of Federal, State, and local authority with respect to the regulation of cable systems." 47 U.S.C.A. § 521(1), (3). If the Pro Rata Law were interpreted as a "customer service" law that is permitted under § 552(d)(2) of the Cable Act, rather than a rate regulation that is prohibited by § 543(a)(2), those purposes would be undermined. States could regulate cable service rates under the guise of imposing customer service requirements, for instance, by requiring rebates and credits for different bundling and subscription selections, creating a risk of inconsistent local and regional policies and increasing the potential for confusion regarding the relationship between federal, state, and local authorities.

Accordingly, I conclude that the credit and rebate requirements imposed by the Pro Rata Law are "rate regulations" under § 543(a)(2) and not "customer service requirements" within the meaning of § 552(d)(2).

**C.    Summary**

Maine's Pro Rata Law seeks to align cable operators' billing practices with reasonable public expectations regarding the way cable system operators should charge for cable service. *See An Act To Require a Cable System Operator To Provide a Pro Rata Credit When Service Is Cancelled by a Subscriber: Hearing on L.D. 2031 Before the J. Standing Comm. on Energy, Utils. & Tech.*, 129th Legis. (2020) (testimony of Rep. Seth Berry, House Chair, J. Standing Comm. on Energy, Utils. & Tech.). However, in enacting § 543(a)(2) of the Cable Act, Congress intended to ensure that "market forces," and not state governments, "control the rates charged by cable companies." *Finneran*, 954 F.2d at 100; *see also* 47 U.S.C.A. § 521(6). The Pro Rata Law runs afoul of this intent by dictating the units of time by which cable operators such as Charter may sell cable service. *See Time Warner Entm't Co. v. FCC*, 56 F.3d 151, 191 (D.C. Cir. 1995) (describing Congress' intention to have market forces control rates as a "hallmark purpose" of the Cable Act). It therefore regulates "rates for the provision of cable service," which is prohibited by § 543(a)(2) of the Cable Act.

Having considered the relevant statutory text, context, and purposes, and treating the facts alleged by Charter as true as I must on a motion to dismiss, I conclude that Maine's Pro Rata Law is unambiguously preempted by §§ 543(a)(2) and 556(c) of the Cable Act. Because I do not find § 543(a)(2) to be susceptible of more

than one plausible reading in the context of this case, I do not apply the presumption against preemption.

## IV.  CONCLUSION

For the foregoing reasons, the Attorney General's motion to dismiss (ECF No. 12) is **DENIED**.

**SO ORDERED.**

**Dated:  October 7, 2020**

     /s/ JON D. LEVY     
**CHIEF U.S. DISTRICT JUDGE**
