# United States Court of Appeals
## For the First Circuit

No. 20-2142

SPECTRUM NORTHEAST, LLC; CHARTER COMMUNICATIONS, INC.,

Plaintiffs, Appellees,

v.

AARON FREY, in his official capacity as Attorney General of the
State of Maine,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Jon D. Levy, U.S. District Judge]

Before

Thompson, Dyk,* and Barron
Circuit Judges.

Paul E. Suitter, Assistant Attorney General, with whom Aaron
M. Frey, Attorney General, and Christopher C. Taub, Chief Deputy
Attorney General, were on the brief, for appellant.
Matthew S. Hellman, with whom Howard J. Symons, Jonathan A.
Langlinais, Allison M. Tjemsland, Joshua D. Dunlap, Jenner & Block
LLP, and Pierce Atwood LLP were on the brief, for appellee.

January 4, 2022

---

* Of the Federal Circuit, sitting by designation.

DYK, **Circuit Judge**.  The Cable Communications Act of 1984 ("Cable Act") preempts state laws that regulate "rates for the provision of cable service" if the Federal Communications Commission ("FCC") has determined that cable operators in that state are "subject to effective competition."  47 U.S.C. §§ 543(a)(2), 556(c).  Recently, Maine, a state that has effective competition, see 47 C.F.R. § 76.906 (2020), enacted a statute that requires cable operators to grant subscribers, if they cancel their cable service three or more days prior to the end of a billing period, pro rata credits or rebates for the days remaining in the billing period after the termination of cable service.  We must decide whether this Maine statute is preempted by the Cable Act. We hold that it is not because it does not regulate "rates for the provision of cable service."  We do not reach the question whether it is also a "customer service requirement" exempt from preemption.

**I.**

On March 18, 2020, Maine adopted "An Act to Require a Cable System Operator to Provide a Pro Rata Credit When Service Is Cancelled by a Subscriber" ("Pro Rata Act") into law.  As relevant here, the legislation amended Me. Stat. tit. 30-A, § 3010, titled "Consumer rights and protection relating to cable television service," to add:  "A franchisee shall grant a subscriber a pro rata credit or rebate for the days of the monthly billing period after the cancellation of service if that subscriber requests

- 2 -

cancellation of service 3 or more working days before the end of the monthly billing period."  Me. Stat. tit. 30-A, § 3010(1-A) (2021).  The Pro Rata Act also requires that cable providers notify consumers of their right to a pro rata credit in "nontechnical language, understandable by the general public."  Id. § 3010(2-A).  The Act was to become effective on June 16, 2020.  According to the Pro Rata Act's sponsor in the Maine House of Representatives, the purpose of the statute was to "reform unfair cable company billing practices" by requiring Maine "cable providers . . . to pro-rate charges when a customer disconnects service."  In the legislator's view, the Pro Rata Act would "protect cable customers from paying for service they do not receive."

## II.

The Cable Act expressly preempts state regulation of "rates for the provision of cable service."  47 U.S.C. § 543(a)(2).  Specifically, "the rates for the provision of cable service . . . shall not be subject to regulation" by the FCC, states, or local authorities when "a cable system is subject to effective competition."  Id.  If there is not effective competition,[1] local authorities may regulate "rates for the

---

[1] Under federal rules set by the FCC, "effective competition" is presumed in all markets unless rebutted.  47 C.F.R. § 76.906. There is no dispute here that cable operators in Maine are subject to effective competition.

provision of basic cable service" pursuant to regulations promulgated by the FCC pursuant to § 543.  § 543(a)-(b).  Basic cable service constitutes the minimum tier of service and generally includes, for each locality, all over-the-air broadcast television channels, required public access channels, and additional channels added to the basic tier by the cable operator.  See 47 C.F.R. § 76.901(a).  Rates for cable programming services beyond basic cable service, i.e., nonbasic, higher-tier program packages or premium, pay-per-channel offerings, cannot be regulated even if there is not effective competition.  § 543(a)(1)-(2), (b)(1), (c)(4).  However, "customer service requirements" are exempt from preemption under 47 U.S.C. § 552(d)(2).

On May 11, 2020, Spectrum Northeast, LLC and Charter Communications, Inc. ("Spectrum") filed suit in the United States District Court for the District of Maine, challenging the new law, requesting a declaratory judgment that the law is preempted by the Cable Act, and moving to preliminarily enjoin enforcement of the law.  Spectrum argued that the FCC has determined that cable providers in Maine are "subject to effective competition" and that the Pro Rata Act is preempted by the Cable Act because it is an attempt to regulate "rates for the provision of cable service." § 543(a)(2).  The Attorney General moved to dismiss the complaint, contending that the Pro Rata Act was not preempted.

The district court stayed the preliminary-injunction

- 4 -

briefing while it considered the Attorney General's motion to dismiss. On October 7, 2020, the district court denied the Attorney General's motion to dismiss, concluding that the Pro Rata Act "regulates 'rates for the provision of cable service,' which is prohibited by § 543(a)(2) of the Cable Act." In reaching this conclusion, the district court found "Maine's Pro Rata Law does not regulate a one-time cancellation or deinstallation fee but operates directly on the rate that Charter may charge for providing a certain quantity of cable service before a customer cancels service." Spectrum Ne. LLC v. Frey, 496 F. Supp. 3d 507, 514 (D. Me. 2020). The court accepted Spectrum's argument that "it provides cable service at a monthly, not daily, rate" and that the "whole-month billing policy effectively charges a higher daily rate to subscribers who cancel their service mid-month than to subscribers who do not cancel, because Charter sells cable service in monthly increments." Id. at 513. Despite acknowledging that "the Pro Rata Law applies only to the month in which a subscriber cancels her cable service," the district court nonetheless found the law's "prohibition on charges for service that was not provided [has] the effect of prescribing a daily rate for the service that was provided before the cancellation." Id. at 514.

The court also rejected Maine's argument that the law is a "customer service requirement" exempted from preemption in

- 5 -

§ 552(d)(2) of the Cable Act.[2]  The court noted the same section
of the Cable Act requires the FCC to set minimum "customer service
requirements" governing "(1) cable system office hours and
telephone availability; (2) installations, outages, and service
calls; and (3) communications between the cable operator and the
subscriber (including standards governing bills and refunds)."
Spectrum, 496 F. Supp. 3d at 515 (citing 47 U.S.C. § 552(b)).  The
court held that Maine's "Pro Rata Law cannot be characterized as

---

[2] Section 552(b) states in pertinent part:

> The Commission shall . . . establish standards by which
> cable operators may fulfill their customer service
> requirements.  Such standards shall include, at a
> minimum, requirements governing—
>
> (1) cable system office hours and telephone availability;
>
> (2) installations, outages, and service calls; and
>
> (3) communications between the cable operator and the
> subscriber (including standards governing bills and
> refunds).

Section 552(d)(2) states:

> (2) Customer service requirement agreements
>
> Nothing in this section shall be construed to preclude
> a franchising authority and a cable operator from
> agreeing to customer service requirements that exceed
> the standards established by the Commission under
> subsection (b). Nothing in this subchapter shall be
> construed to prevent the establishment or enforcement of
> any municipal law or regulation, or any State law,
> concerning customer service that imposes customer
> service requirements that exceed the standards set by
> the Commission under this section, or that addresses
> matters not addressed by the standards set by the
> Commission under this section.

a 'law concerning customer service'" (exempted from preemption).
Id., at 515–16.  The court acknowledged that "customer service
requirements" are not limited to the minimum federal standards and
confirmed both that "some laws requiring cable operators to grant
credits, rebates, or refunds might meet" a dictionary definition
of customer service and that the legislative history, discussed in
detail infra, "may" support reading customer service to encompass
rebates and credits.  Id. at 516.  But the court nonetheless
concluded that the Pro Rata Act "goes well beyond" customer service
and "directly regulates the rates" that Spectrum charges.  Id.

In light of the district court's conclusion that the Pro
Rata Act was "preempted by the [Cable Act] as a matter of law,"
the parties stipulated that "there [were] no remaining genuine
issues of fact for the [district court] to resolve and that
[Spectrum] [was] entitled to judgment as a matter of law."  Joint
Mot. to Grant Summ. J. to Pls. & Enter Final J. 1, 4, No. 20-cv-
168, ECF No. 33 (internal citations omitted).  The district court
entered judgment for Spectrum, granting declaratory relief that
the Pro Rata Act is preempted by the Cable Act.[3]

The Attorney General now appeals.  We have jurisdiction

---

[3] The court's judgment did not grant the preliminary injunction,
but the Attorney General agreed that "he will not seek to enforce,
directly or indirectly, the Pro Rata [Act] absent vacatur or
reversal."  Final J., No. 20-cv-168, ECF No. 34.

under 28 U.S.C. § 1291.[4]

### III.

The sole issue in this case is whether Maine's Pro Rata Act is preempted by federal law. The parties agree that this question is purely one of law. We review a district court's legal conclusions de novo. Lawless v. Steward Health Care Sys., LLC, 894 F.3d 9, 21 (1st Cir. 2018).

### A.

"In any preemption analysis, '[t]he purpose of Congress is the ultimate touchstone.'" Philip Morris Inc. v. Harshbarger, 122 F.3d 58, 67 (1st Cir. 1997) (quoting Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 138 (1990)); see also Gobeille v. Liberty

---

[4] On June 22, 2021, this court invited the FCC to file an amicus brief in this appeal addressing the following questions:

> 1. Whether the Maine statute, Me. Stat. tit. 30-A, § 3010(1-A), constitutes the regulation of "rates for the provision of cable service" preempted by 47 U.S.C. § 543(a)(2).

> 2. At the time of the enactment of the Cable Communications Policy Act of 1984, in what respects were states regulating "rates for the provision of cable service"?

> 3. Any other relevant analysis or information that the Commission believes would be helpful to this court.

Order (June 22, 2021), No. 20-2142, ECF No. 00117755456. On August 23, 2021, the FCC declined this Court's invitation to file an amicus brief, stating, "After due consideration, we have determined that we do not have anything material to add to the party submissions." Letter (Aug. 23, 2021), No 20-2142, ECF No. 00117778108.

Mut. Ins. Co., 577 U.S. 312, 324 (2016) ("[P]re-emption claims
turn on Congress's intent.").

The parties agree that the question here is one of
express preemption as the Cable Act contains a specific preemption
provision.  There is no issue as to congressional authority to
preempt state law regulating the provision of cable service.  Our
task is to determine the scope of the federal statute and "to
identify which state laws are preempted."  Brown v. United
Airlines, Inc., 720 F.3d 60, 63 (1st Cir. 2013).  That inquiry
"start[s] with the text and context of the provision itself," and
"[o]ur analysis is informed by the statutory structure, purpose,
and history."  Tobin v. Fed. Express Corp., 775 F.3d 448, 452 (1st
Cir. 2014).

**B.**

The parties disagree as to whether the general
presumption against preemption applies in this case.  Because we
conclude that the structure and legislative history of the Cable
Act and its amendments compel a finding of no preemption of the
Pro Rata Act, we need not address whether the presumption against
preemption applies here.

**C.**

The Cable Act includes both general and specific
preemption provisions.  The general preemption provision states,
"any provision of law of any State . . . or franchising authority

- 9 -

. . . which is inconsistent with this chapter shall be deemed to be preempted and superseded."  47 U.S.C. § 556(c).  This Court recently had occasion to review this provision in the context of public, educational, and government (PEG) access requirements and rural service availability requirements.  <u>NCTA -- The Internet & Television Ass'n</u> v. <u>Frey</u>, 7 F.4th 1, 3–4 (1st Cir. 2021) (rejecting preemption challenge and upholding Maine law addressing PEG channels and rural service availability).  We now consider the question in the context of rate regulation subject to a specific preemption provision relevant here.  This provision states, "the rates for the provision of cable service . . . shall not be subject to regulation by the [Federal Communications] Commission or by a State or franchising authority under this section."  § 543(a)(2).  The parties dispute whether Maine's Pro Rata Act is a regulation of "rates for the provision of cable service" within the meaning of § 543(a)(2).

The parties agree that the Cable Act here neither defines "rates" nor "rates for the provision of cable service."  Given this statutory silence, they agree that plain and ordinary meaning of terms, informed by the purpose and history of the Cable Act, should guide our analysis.  They even do not dispute the plain and ordinary meaning of the term "rate"--that a "rate" is "the amount charged for a particular product; [] as defined by a particular unit of measurement in relation to the product."  Appellant's Br.

- 10 -

15.  As the FCC has explained, in a different context (addressed
infra),

> [A] "rate" has no significance without the
> element of service for which it applies. . . .
> the term "rate" is defined in the dictionary
> as an "amount of payment or charge based on
> some other amount." In this regard also, the
> Supreme Court has recently stated: "Rates,
> however, do not exist in isolation. They have
> meaning only when one knows the services to
> which they are attached."

Sw. Bell Mobile Sys., Inc., 14 F.C.C. Rcd. 19,898, 19,906 (1999)

(internal citations omitted) (citing WEBSTER'S THIRD NEW INTERNATIONAL

DICTIONARY (1993); AT&T Co. v. Cent. Off. Tel., Inc., 524 U.S. 214,

223 (1998)).  Thus, as the FCC acknowledged, a "rate" depends not

only on the price charged, but also on the type and amount of

service provided.

But that is where the agreement ends.  The parties

propose two different interpretations of the statutory language

"rates for the provision of cable service" in § 543(a)(2).

Spectrum argues that Maine's Pro Rata Act is a form of rate

regulation because, in Spectrum's view, it "must measure the

quantity of service it provides in daily increments [during the

last month of service], rather than monthly increments" in order

to provide the pro rata credits required by the law.  Appellees'

Br. 19.  The Attorney General argues that Maine's Pro Rata Act

does not force a cable provider "to sell its product by 'daily'

rates rather than a 'monthly' rate," but instead, the law "merely

requires [Spectrum] to refund customers for the portion of their final monthly billing cycle, at the rate charged by [Spectrum], in which they did not receive cable service." Appellant's Br. 17–18. Further, the Attorney General argues, Maine's Pro Rata Act only applies to a period after termination. "[A]lthough the Cable Act prohibits states from setting rates for the provision of cable service, the statute does not prohibit states from protecting citizens from being charged for cable services that are never provided." Appellant's Br. 21–22.

We think that the language "provision of cable service" most naturally refers to the amount a subscriber is charged for receiving cable service, i.e., the price per month or per channel, or for equipment required to receive the subscribed-to programming of the cable service. In our view, the rate for "the provision of cable service" is not naturally read to encompass a termination rebate. A termination event ends cable service, and a rebate on termination falls outside the "provision of cable service." Thus, the plain language of § 543 excludes the time after provision of service--i.e., the only time when Maine's Pro Rata Act applies. Significantly, Spectrum conceded at oral argument that a state law requiring pro rata rebates for periods of service outage would not be rate regulation (but would instead be consumer protection).

To see why this narrow reading of the scope of § 543(a)(1)'s expressly preemptive ban may be warranted, it helps

to focus on the difference between a hypothetical state law that would cap the amount that a cable operator could charge a customer on an ongoing monthly basis for cable service and the Maine law that is at issue here.

There is no question that § 543(a)(1)'s preemption of a state regulation of "the rates for the provision of cable service," § 543(a)(1), would encompass the hypothetical state law that sets a $50 cap. In fact, we do not understand Maine to suggest otherwise. But, Maine's termination-rebate law differs from that hypothetical monthly cap on what may be charged for cable service because it regulates only the charge that the cable operator may impose on a customer for the month in which that customer has terminated--i.e., when the cable operator no longer provides-- "cable service." It is difficult to conclude that Maine's termination rebate law regulates "the rates for the provision of cable service," § 543(a)(1) (emphasis added), even though there can be no question that the posited measure that imposes the $50 monthly cap would. The history of the Cable Act confirms the correctness of this interpretation.

## IV.

On its inception in 1948 and in the two decades thereafter, cable primarily served to retransmit over-the-air broadcast signals, particularly in areas where such signals experienced interference. This was referred to as community

- 13 -

antenna television (CATV): systems that connected households to a community antenna that brought broadcast reception by wire to households where a signal was otherwise unavailable. S. REP. NO. 98-67, at 5–6 (1983). These systems did not initially include additional, non-broadcast programming. H.R. REP. NO. 98-934, at 20–21 (1984). Early regulation focused on a franchising process between local governments and cable operators, which allowed the use of streets and rights of way and imposed various service requirements. S. REP. NO. 98-67, at 6–7.

During the period from the development of the first commercial cable system until the FCC's first comprehensive regulation of cable in 1972, some state and local governments prohibited cable operators from charging rates in excess of upper limits set in the franchise agreements with cable operators. MARTIN H. SEIDEN, AN ECONOMIC ANALYSIS OF COMMUNITY ANTENNA TELEVISION SYSTEMS AND THE TELEVISION BROADCASTING INDUSTRY, 46 (1965); see S. REP. NO. 98-67, at 5, 7; Cable Television Ass'n v. Finneran, 954 F.2d 91, 95–96 (2d Cir. 1992). The precise nature of that rate regulation across franchising authorities and states is, however, unclear, though it appears that it focused on regulating monthly charges.[5]

At the federal level, the FCC "gradually asserted jurisdiction over" cable television beginning in 1960. United

---

[5] See note 7, infra.

States v. Sw. Cable Co., 392 U.S. 157, 165 (1968).  In 1968 in
Southwestern Cable, the Supreme Court recognized that the FCC could
regulate cable under its existing statutory authority, but such
regulatory authority was "restricted to that reasonably ancillary
to the effective performance of the Commission's various
responsibilities for the regulation of [over-the-air] television
broadcasting."  Id. at 178.  Southwestern Cable did not address
the FCC's ability to regulate cable rates or to preempt state rate
regulation.

Before the early 1970s, cable's primary function was
still to improve access to broadcast television programming by
distributing, or retransmitting, the broadcast signals via cable.
See S. REP. No. 98-67, at 6.  In 1972, the FCC attempted to "define
the boundaries of federal and state regulation" with its first
comprehensive rulemaking for cable, and these regulations included
rules regarding subscriber rate regulation.  Finneran, 954 F.2d
at 96; Cable Television Rep. and Ord., 36 F.C.C.2d 143, 207–10
(1972).  The 1972 order adopted rules requiring local franchise
authorities to have "specified or approved the initial rates which
the franchisee charges subscribers for installation of equipment
and regular subscriber services."  47 C.F.R. § 76.31(a)(4) (1972).
The order explained that § 76.31(a)(4) applied to regulation of
rates "for services regularly furnished to all subscribers" and
that the proper standard was "the maintenance of rates that are

fair to the system and to the subscribing public." Cable
Television Ord., 36 F.C.C.2d at 209; see S. REP. NO. 98-67, at 9
(discussing FCC's 1972 Rulemaking). Although premium, or nonbasic
cable programming was developing, the FCC's instruction to
regulate rates in 1972 focused on the basic cable tier and excluded
higher tiers with specialized programming. Cable Television Ord.,
36 F.C.C.2d at 209; Clarification of the Cable Television Rules,
46 F.C.C.2d 175, 199-200 (1974).

In 1974, the FCC determined it would preempt state
regulation of rates for premium service. The FCC viewed this
nascent category as any "specialized programming for which a per-
program or per-channel charge is made" that was separate from
"regular subscriber service" including "all broadcast signal
carriage and all [the FCC's] required access channels."
Clarification, 46 F.C.C.2d at 199. The FCC determined that "there
should be no regulation of rates for such [specialized] services
at all by any governmental level" and clarified that "for now we
are pre-empting the field and have decided not to impose
restrictive regulations." Id. at 199-200; see Cap. Cities Cable,
Inc. v. Crisp, 467 U.S. 691, 702-703, 703 n. 9 (1984) (explaining
the FCC's preemption and exclusion from regulation of nonbasic
cable service).

In 1976, the FCC changed course and determined that
"deletion of Section 76.31(a)(4) [requiring local rate regulation

- 16 -

for basic service] would be advisable." Rep. and Ord., 60 F.C.C.2d 672, 682 (1976). The FCC deleted the rule primarily due to problems for local authorities that did "not hav[e] the jurisdiction to . . . regulate rates" or that "found subscriber rate regulation to be either onerous or unnecessary." Id. at 673. The FCC explained that deletion "will enable local authorities to decide whether subscriber rates should be regulated, and will best facilitate experimentation in the types of rate controls exercised." Id. at 682.

The result was "that local authorities should be permitted to decide for themselves whether they will undertake such regulation." Id. at 683. The "regular subscriber services" required to be regulated prior to deletion of the rule were "charges for installation, disconnection and reconnection as well as charges for broadcast signal carriage and all required access channels, including origination programming." Id. at 673 n.1.[6]

---

[6] The FCC's 1976 order deleting its 1972 regulation of rates for "services regularly furnished to all subscribers" stated in a footnote that such regulation included "disconnection" charges, Rep. and Ord., 60 F.C.C.2d at 673 n.1, which reads as follows:

> The subscriber rates whose regulation is at issue in this proceeding are rates charged for services regularly provided to all cable subscribers: that is, charges for installation, disconnection and reconnection as well as charges for broadcast signal carriage and all required access channels, including origination programming. It does not include subscriber rates for specialized programming for which a per-program or per-channel charge is made. The Commission has preempted

Significantly, the 1976 order did not preempt state regulation of regular subscriber services.  Id. at 684-85.

Following the 1976 FCC rulemaking, states continued to engage in rate regulation directed largely to monthly charges for basic service.[7]

In the late 1970s to early 1980s, cable television continued to mature into modern cable with national programming and premium movie channels like Home Box Office ("HBO").  H.R. Rep. No. 98-934, at 20-21.  As the industry matured, the FCC's

jurisdiction of subscriber rates for such specialized programming and has determined that rates for these services should not be regulated by any governmental entity.

[7] See Cox Cable New Orleans, Inc. v. New Orleans, 594 F. Supp. 1452, 1455 (E.D. La. 1984) (addressing a franchise agreement authorizing "a Basic Service package of 31 stations" offered "for $7.95 per month"); Helicon Corp. v. Brownsville, 449 A.2d 118, 118-120 (Pa. Commw. Ct. 1982) (addressing a local ordinance prohibiting a cable operator from charging a "monthly cable television fee in excess of the maximum rate"); Munhall v. Dynamic Cablevision, Inc., 377 A.2d 853, 853-54 (Pa. Commw. Ct. 1977) (addressing a local ordinance permitting cable company to "charge subscribers for its services the sum of $4.95 per month"); Cablevision, Inc. v. Sedalia, 518 S.W.2d 48, 49-50 (Mo. 1974) (addressing an agreement between the cable operator and the city council that the "monthly service rate be $4.50 with no installation charge").

Massachusetts in 1971 enacted legislation requiring the state commission to "fix and establish" a "fair and reasonable rate of return from subscription rates charged to subscribers" for cable. M.G.L.A. 166A § 15 (1976) (originally enacted Nov. 16, 1971).  The Massachusetts legislation initially limited the "monthly charge to subscribers" to "seven dollars" until the cable commission could determine rates and charges under the state statute.  St. 1971, c. 1103, § 2 (Nov. 16, 1971).

- 18 -

position on cable began to shift "from viewing cable as merely a
threat to established broadcasters to viewing cable as a
significant communications media of its own." <u>Finneran</u>, 954 F.2d
at 96.  The FCC preemption of state regulation continued to be
limited to nonbasic cable services.  In 1983 in <u>In Re: Community
Cable TV</u>, 95 F.C.C.2d 1204, 1204, 1218 (1983), the FCC considered
and expanded its preemption of regulation to "specialized or
auxiliary cable services—primarily satellite-delivered
programming—of the kind commonly provided in tiers of services
offered to subscribers at a single package rate distinct from the
rate charged for regular subscriber services."  The FCC noted it
had "preempted state regulation of non-basic program offerings,
both non-broadcast programs and broadcast programs," and it
concluded "we see no reason . . . to limit the scope of our
preemption of state and local rate regulation of services not
regularly provided to all subscribers."  95 F.C.C.2d at 1215,
1218; <u>see</u> <u>Finneran</u>, 954 F.2d at 97; <u>Cap. Cities</u>, 467 U.S. at 703;
H.R. Rep. No. 98-934, at 24.  The FCC continued not to preempt
state regulation of rates for basic cable service.

The Supreme Court, in 1984, upheld the FCC's
jurisdiction and authority to preempt state regulation, including
the regulation at issue in that case, which required cable
operators "to delete all advertisements for alcoholic beverages
contained in the out-of-state signals that they retransmit by

cable." Cap. Cities, 467 U.S. at 694. Capital Cities expanded the FCC's jurisdiction beyond the "reasonably ancillary" requirement in Southwestern Cable and "placed within the FCC's discretion the power to pre-empt virtually any state regulation of the cable industry." Finneran, 954 F.2d at 97.

**V.**

Against this backdrop, in 1984, Congress passed the statute at issue here--the Cable Communications Policy Act of 1984 ("Cable Act"), which created the first federal legislative scheme for the regulation of cable television. Cable Act, Pub. L. No. 98-549, 98 Stat. 2779 (1984). The Cable Act implemented a "uniform national policy" of deregulation intended to "eliminate and prevent conflicting and counterproductive regulations" and encourage competition. S. REP. NO. 98-67, at 17. Preemption was no longer limited to rates for nonbasic service. It applied as well to rate regulation for the "provision of basic cable service." § 623(b)(1), 98 Stat. at 2788. The Act included the general and specific preemption provisions codified in 47 U.S.C. §§ 556(c) and 543(a). They provide now, as they essentially did then, that "any provision of law of any State . . . or franchising authority . . . which is inconsistent with this chapter shall be deemed to be preempted and superseded" and "[n]o Federal agency or State may regulate the rates for the provision of cable service" subject to the exception in the absence of "effective competition."

- 20 -

§§ 556(c), 543(a)(1)-(2).  "Effective competition" was so broadly defined that "97 percent of all cable systems" were exempt from rate regulation within a few years of enactment.  S. REP. NO. 102-92, at 3 (1991).

The FCC was required, where there was no effective competition, to "prescribe and make effective regulations which authorize a franchising authority to regulate rates for the provision of basic cable service" and to "establish standards for such rate regulation."  § 623(b)(1)-(2), 98 Stat. at 2788.  For the purpose of rate regulation under this section, the FCC defined "basic cable service" in 1985 to mean "the tier of service regularly provided to all subscribers that includes the retransmission of all must-carry broadcast television signals . . . and the public, educational and governmental channels, if required by a franchising authority."  Implementation of the Provisions of the Cable Communc'ns Pol'y Act of 1984, 50 Fed. Reg. 18,648, 18,653 (May 2, 1985).  The regulation of a nonbasic service tier continued to be preempted whether or not there was effective competition.  See id. at 18,649.

While the Cable Act largely deregulated basic cable service, and also preempted rate regulation for the provision of basic cable service (when cable operators faced "effective competition"), the new statute preserved state authority to adopt consumer protection laws.  See 47 U.S.C. § 552(d).  Section 552

- 21 -

as enacted left to the states the ability to "enact[] or enforc[e]" consumer protection laws "to the extent not inconsistent with this title." Significantly, state "customer service requirements" were not preempted. § 632(a)-(c), 98 Stat. at 2796. According to House Report 934, these customer service requirements reserved to the states include "requirements related to interruption of service; disconnection; rebates and credits to customers; deadlines to respond to consumer requests or complaints; the location of the operator's consumer services offices; and the provision to customers (or potential customers) of information on billing or services." H.R. REP. No. 98-934, at 79. The House report is particularly authoritative because the Senate specifically adopted the explanation in House Report 934 when it concurred in the House amendments. 130 CONG. REC. 31,871 (1984).

Pursuant to the mandate in the 1984 Act, the FCC conducted a rulemaking to address the definition of effective competition and to determine what "procedures and methodologies" state or local authorities "must follow in regulating basic cable service rates" in the absence of effective competition. Implementation of the Provisions of the Cable Commnc'ns Pol'y Act of 1984, 50 Fed. Reg. at 18,654. The FCC decided to leave the specific structure and rules of rate regulation to local franchising authorities. Id. at 18,651-55. Thus, although the FCC required notice, opportunity to respond, and a formal statement

for the process of rate regulation by local franchising authorities, it did not otherwise establish rules regulating rates. Id.

In the years following the Cable Act, cable rates increased substantially, leading to an amendment to the 1984 Cable Act--the Cable Television Consumer Protection and Competition Act of 1992 ("1992 Amendments"). S. REP. NO. 102-92, at 3-8, 18-20; see Cable Television Consumer Prot. and Competition Act of 1992, Pub. L. No. 102-385, 106 Stat. 1460 (1992). The 1992 Amendments maintained many of the provisions of the 1984 Cable Act but made several significant adjustments. The 1992 Amendments adopted an updated and more limited definition for "effective competition" such that many cable operators were no longer exempt from rate regulation. § 3, 106 Stat. at 1470. They extended the rate regulation allowed (in the absence of effective competition) to include a heavily subscribed tier above the most basic cable service tier if the most basic tier was not heavily subscribed. S. REP. NO. 102-92, at 63. The 1992 Amendments also required the FCC to set more detailed rules "identifying, in individual cases, rates for cable programming services that are unreasonable" and "the procedures to be used to reduce rates for cable programming services that are determined by the Commission to be unreasonable." § 3, 106 Stat. at 1468.

The 1992 Amendments also clarified the exclusion from

- 23 -

preemption for consumer protection laws and customer service requirements. The earlier Cable Act in 1984 included a carve-out from preemption for consumer protection laws "not inconsistent with this title." § 632, 98 Stat. at 2796. The 1992 Amendments changed the language of the preemption carve-out in § 552(d)(1)[8] to preserve a state's ability to "enact[] or enforc[e]" consumer protection laws "not specifically preempted by this title." § 8, 106 Stat. at 1484. Congress included the clarification in § 552(d)(1) to indicate "that state and local authorities retain all authority to enact and enforce consumer protection laws that they have under current law." H.R. REP. NO. 102-628, at 105–106 (1992).

The 1992 Amendments also restructured and clarified a distinct carve-out for "customer service requirements" by preserving "the establishment or enforcement of . . . any State law, concerning customer service that imposes customer service requirements that exceed . . . , or that addresses matters not addressed by" the minimum standards set by the FCC. § 552(d)(2). The distinct carve-out in § 552(d)(2) was added to clarify that the "legislation allows local authorities . . . to establish and enforce laws that impose more stringent customer service requirements." H.R. REP. NO. 102-628, at 35–37. In other words,

---

[8] Section 552(d) was enacted as § 552(c).

§ 552(d)(2) now specifically excepted state customer service requirements from the preemption provision. With this amendment, Congress again confirmed that "customer service requirements . . . relate to interruption of service; disconnection; rebates and credits to consumers;" etc. Id. at 34.

The 1992 Amendments for the first time required the FCC to set federal minimum customer service requirements for three categories. These were "(1) cable system office hours and telephone availability; (2) installations, outages, and service calls; and (3) communications between the cable operator and the subscriber (including standards governing bills and refunds)." 47 U.S.C. § 552(b).

Pursuant to the 1992 Amendments, the FCC conducted a rulemaking to redefine "effective competition" and adopt more specific rate regulation requirements. Cable Television Act and Cable Television Sys., 58 Fed. Reg. 29,736 (May 21, 1993). The FCC's rulemaking replaced the previous light-touch rate regulations in 47 C.F.R. § 76.33 (1985), promulgated under the 1984 Cable Act, with an entire sub-chapter for "Cable Rate Regulation." Id. at 29,753. The sub-chapter specifically regulated rates in a new section, 47 C.F.R. § 76.922, which set the "maximum monthly charge per subscriber for a tier of regulated programming services offered by a cable system" in terms of the "permitted per channel charge multiplied by the number of channels

on the tier, plus a charge for franchise fees." Id. at 29,756.
The regulations did not regulate termination fees or termination
rebates.

Four years later, Congress enacted the
Telecommunications Act of 1996 ("1996 Amendments"), modifying the
1992 Amendments.  Telecomms. Act of 1996, Pub. L. No. 104-104,
§ 301, 110 Stat. 56, 115 (1996).  Relevant portions of the 1996
Amendments confined rate regulation (in the absence of effective
competition) to the basic tier of cable service.  § 301(b)-(c),
110 Stat. at 115-16.  In 2015, the FCC promulgated a rule presuming
"effective competition" in all markets unless rebutted by the local
franchising authority--effectively ending rate regulation in all
but two markets.  47 C.F.R. § 76.906; see Mass. Dep't of Telecomms.
& Cable v. FCC, 983 F.3d 28, 32 n.1 (1st Cir. 2020).

**VI.**

Four aspects of the structure and legislative history
support our conclusion that the preemption of "rates for the
provision of cable service" does not extend to the regulation of
termination rebates.

**A.**

First, the legislative history of the Cable Act and the
FCC's regulations (evidencing the FCC's interpretation of the
congressional mandate) focused on preempting monthly "rates"

charged for the provision of basic cable service.[9]  The legislative history of the 1984 Cable Act does not suggest a concern with, or a purpose to preempt, state regulation of termination fees or termination rebates.  Nor does it suggest that the term "rates for the provision of cable service" includes termination fees or termination rebates.  47 C.F.R. § 76.922(a).  The focus in the later amendments was similarly on monthly rates for basic cable service and not on termination fees and termination rebates.  For example, in passing the 1992 Amendments, Congress' first finding highlighted the increase in "monthly rates for the lowest priced basic cable service."  § 2(a)(1), 106 Stat. at 1460.

The regulations promulgated by the FCC to ensure reasonable rates (in the absence of effective competition)

---

[9] For example, the legislative history of the Cable Act as proposed in 1984 illustrates the definition of "basic cable service" in terms of monthly prices:

> [A]ny service tier which is separately offered and does not include the retransmission of local broadcast signals is not basic cable service, for purposes of Title VI. For instance, a single tier which includes the retransmission of local broadcast signals together with other cable services, and which is offered to subscribers for $7 per month, is basic cable service. By contrast, if a tier includes only those other cable services for $2 per month, and the subscriber must purchase a $5 tier in order to receive the retransmitted local broadcast signals, then the $2 tier is not basic cable service-even if the subscriber must "buy through" the $5 tier in order to be able to purchase the $2 tier.

H.R. Rep. No. 98-934, at 40.

similarly focused on monthly prices for basic cable service. The FCC's regulations set the "maximum monthly charge per subscriber for a tier of regulated programming services." 47 C.F.R. § 76.922(a). Copious details, factors, and requirements followed that are related to that maximum monthly charge per subscriber. See § 76.922. These FCC regulations similarly do not discuss or address termination rebates or termination fees.

Spectrum has not identified, and we have not found, any reference to preempting state regulation of termination rebates in the history of federal cable regulation. There is no reference at all to termination rebates, and the only reference to disconnection fees in the context of rate regulation was in a footnote (quoted earlier in Section IV) in the context of an FCC rule *requiring* local authorities to have "specified or approved the initial rates" charged to subscribers by a cable company "for installation of equipment and regular subscriber services" (a rule abandoned by the FCC in 1976).[10] 47 C.F.R. § 76.31(a)(4) (1972).

**B.**

Second, the congressional silence concerning termination

---

[10] While the FCC did not propose to preempt termination fees, it did collect, pursuant to the congressional mandate in § 543(k), information about "(a) Rates charged for basic cable service, cable programming services, and other cable programming; (b) fees for converter boxes, remote control units, installation and disconnection; and (c) any other charges for equipment or service levied on subscribers." Cable Television Act and Cable Television Sys., 58 Fed. Reg. at 29,749.

fees or rebates is particularly significant because Congress required regulation of rates for installation of equipment for basic cable service (in the absence of effective competition). In the 1984 Cable Act, Congress required the FCC to "regulate rates for the initial installation or the rental of 1 set of the minimum equipment which is necessary for the subscriber's receipt of basic cable service" (in the absence of effective competition). § 623(c)(3), 98 Stat. at 2789. As amended by the 1992 Amendments, § 543 now states, "The regulations prescribed by the Commission under this subsection shall include standards to establish, on the basis of actual cost, the price or rate for-(A) installation and lease of the equipment used by subscribers to receive the basic service tier . . . ." § 543(b)(3). Installation fees were viewed as rates "for the provision of cable service." Termination fees were not.

Relatedly, Congress did not address prices or rates for service termination even though Congress well knew service termination occurred and addressed the disposition of cable wiring "upon termination of service." 47 U.S.C. § 544(i).

### c.

Third, The Cable Act established a federal preference for competition through market forces because such competition would "keep the rates for basic cable services reasonable in that market without the need for regulation." H.R. REP. NO. 98-934, at

25; S. REP. NO. 98-67, at 5, 17, 22. Congress barred state regulation only where "marketplace forces would determine and control rates." S. REP. NO. 98-67, at 22. Congress acknowledged multiple potential sources of competition including "multipoint distribution services, subscription television stations, videodiscs and cassettes, master antenna television and satellite master antenna television systems, low power television stations, and direct satellite-to-home broadcast systems." Id., at 5.

Spectrum has not suggested how relatively small, pro rata termination credits would be controlled by effective competition. If anything, Maine's Pro Rata Act encourages competition by prohibiting cable companies from creating artificial barriers to switching between competitors by charging consumers beyond termination of service. See Finneran, 954 F.2d at 100 (noting how Congress' purpose "to allow market forces to control [] rates" was frustrated by excessive cable downgrade charges that "insulate cable companies from market forces").

**D.**

Fourth, Congress in the 1984 Cable Act and amendments contemplated that the states could continue to adopt and enforce "consumer protection" laws. Generally, Congress expressed a purpose to preserve state consumer protection laws, though at the same time making clear that regulation of "rates for the provision of cable service" was preempted:

> Nothing in this subchapter shall be construed
> to prohibit any State or any franchising
> authority from enacting or enforcing any
> consumer protection law, to the extent not
> specifically preempted by this subchapter.

§ 552(d)(1).[11]  The House Committee Report in 1984 explained:

> Nothing in Title VI is intended to interfere
> with a state's or franchising authority's
> exercise of its authority to enact and enforce
> consumer protection laws, to the extent that
> the exercise of that authority is not
> inconsistent with Title VI. A state or
> franchising authority may not, for instance,
> regulate the rates for cable services in
> violation of section 623 of Title VI, and
> attempt to justify such regulation as a
> "consumer protection" measure.

H.R. Rep. No. 98-934, at 79.  Maine's Pro Rata Act is a consumer

protection law--it has the plain purpose of protecting consumers

from paying for cable after termination of service.

Though a state's ability to adopt consumer protection

laws does not extend to regulating the "rates for the provision of

cable service," this provision and its history show a purpose to

preserve a significant role for state consumer protection laws,

such as Maine's, and favor a narrow reading of the scope of the

preemption provision.  It makes sense in light of the Cable Act's

---

[11] Section 552(d)(1) was enacted in the Cable Act as 47 U.S.C. §
552(c), which provided, with minor differences, the following:

> Nothing in this title shall be construed to
> prohibit any State or any franchising
> authority from enacting or enforcing any
> consumer protection law, to the extent not
> inconsistent with this title.

provision regarding "consumer protection laws" to read the scope of expressly preemptive provisions in a manner that accounts for Congress' evident intent to protect state "consumer protection laws" from preemption absent their being "specifically preempted."

As noted earlier, Spectrum itself appears to concede that Maine's outage-rebate requirement, which requires cable operators to give subscribers a "pro rata credit or rebate" for service outages "for 6 or more consecutive hours in a 30-day period," Me. Rev. Stat. tit. 30-A, § 3010(1)(A), is a "consumer protection law" and so is not preempted. That concession (itself mandated by the language and legislative history of the Cable Act) is significant. If the outage-rebate measure is not preempted because it is a "consumer protection law," then it must be because such an outage-rebate requirement also is not "specifically preempted by" § 543(a). And, if that is so, then it must also follow that Maine's termination-rebate requirement in the Pro Rata Act, too, is both not "specifically preempted" by § 543(a) and is a "consumer protection law." For, while Spectrum does attempt to distinguish the two Maine rebate measures on the ground that the outage-rebate law merely guarantees that a "customer gets the month that he or she paid for," while the termination-rebate law does not, Maine's outage-rebate law applies even when the outage is not the cable operator's fault, as it applies by its plain terms whenever "service to any subscriber is interrupted." Me. Rev.

Stat. tit. 30-A, § 3010(1)(A). Thus, both Maine laws mandate a rebate for non-service that is not owing to any failing on the cable operator's part. Accordingly, Spectrum's own logic for explaining why Maine's outage-rebate requirement is not preempted supports the conclusion that Maine's termination-rebate requirement in the Pro Rata Act must also not be preempted, since Spectrum advances no argument that would permit us to find the termination-rebate law preempted if the outage-rebate law is not.

It is also not a stretch to think that Maine's limited termination-rebate law in the Pro Rata Act protects against the kind of deceptive business practices that consumer protection laws typically target. There are reasons to be concerned that consumers will not recognize that they are being required to pay as much for the days of non-service following termination as they pay for all the preceding days in which the service is provided, just as there are reasons to be concerned that consumers will not recognize that they are signing up to pay for non-service during outages in which the service is not being provided.

And the termination-rebate requirement in the Pro Rata Act is at no risk of being preempted under the general provision for state laws "inconsistent with this chapter," § 556(c), because § 552(d)(1) preserves any "consumer protection law" from preemption unless it is "specifically preempted." Because we find the Pro Rata Act is not specifically preempted under § 543(a)--

and because Spectrum has advanced no other reason as to why it
would otherwise be "inconsistent" with the Cable Act--we find the
Pro Rata Act is not preempted under the general provision in
§ 556(c).

## VII.

Although a few district court cases have followed the
district court here,[12] the relevant cases at the Circuit level
either support our holding or do not contradict it.  In Finneran,
the Second Circuit considered whether New York could regulate rates
charged "to customers wishing to downgrade to a less expensive
level of cable service" by limiting such downgrade charges "to the
company's actual cost."  954 F.2d at 92-93.  The court determined
that such downgrade fees for stepping from a higher tier of cable
service to a lower tier did not constitute regulation of "rates
for the provision of cable service" and were not preempted by

---

[12] A New Jersey Board of Public Utilities (BPU) rule that is similar
to, but not identical with, the Maine Pro Rata Act was found to be
preempted by the Cable Act in Altice USA, Inc. v. Fiordaliso.  No.
3:19-CV-21371-BRM-ZNQ, 2021 WL 1138152, at *5 (D.N.J. Mar. 23,
2021) (unpublished); see Altice USA, Inc. v. New Jersey Bd. of
Pub. Utils., No. 3:19-CV-21371-BRM-ZNQ, 2020 WL 359398, at *1
(D.N.J. Jan. 22, 2020)(explaining the factual background and
granting a preliminary injunction).  That case is also currently
on appeal.  No. 21-1791 (3d Cir. Apr 22, 2021).  The district
court in Altice relied heavily on the district court's decision
below in this case in reaching the same result.  2021 WL 1138152,
at *4-7.  Similarly, a non-precedential state court decision
holding that the same New Jersey BPU rule was preempted by the
Cable Act indirectly relied on the decision on appeal here (through
the D.N.J. decision).  See In re Altice USA, Inc., No. A-1269-19,
2021 WL 4808399 (N.J. Super. Ct. App. Div. Oct. 15, 2021).

§ 543--the same statute governing rate regulation at issue in this case.  Id. at 102.

In reaching that conclusion, the court noted that "Congress left regulation of complete disconnections to the states."  Id. at 101.  The court explained, "we think Congress meant to pre-empt only those state rules that regulate rates charged by cable companies for providing services to customers."  Id. at 102.  Thus, because "a reduction in service is not a provision of service, and since the FCC has not spoken clearly on the matter," the court concluded "that the Cable Act does not expressly pre-empt state regulation of downgrade charges."  Id. at 100.

Spectrum attempts to distinguish Finneran as no longer good law since Congress acted to change the law.  After Finneran, Congress amended the Cable Act to require that "charges for changing the service tier selected shall be based on the cost of such change," similar to the New York regulation in Finneran. § 543(b)(5)(C); 954 F.2d at 93.  But Congress' action does nothing to undermine the reasoning of the court in Finneran--it simply demonstrates that Congress was persuaded to address the same problem the statute at issue in Finneran addressed, but at the federal level.

Spectrum also argues that Time Warner v. FCC, 56 F.3d 151 (D.C. Cir. 1995), supports its position.  We do not find Time

Warner pertinent.  In Time Warner, the court addressed a provision
of the Cable Act stating, "A cable operator shall have a rate
structure, for the provision of cable service, that is uniform
throughout the geographic area in which cable service is provided
over its cable system."  47 U.S.C. § 543(d).  In interpreting this
provision, the FCC had determined "that the uniform rate structure
provision applies not only to regulated systems, but also to
systems subject to effective competition and otherwise exempt from
rate regulation."  Time Warner, 56 F.3d at 190.  The court
concluded that the exemption from rate regulation for systems
facing "effective competition" exempts cable operators "from any
rate regulation that the Commission or franchising authorities
promulgate 'under this section [543],'" and thus set aside the
FCC's decision.  Id. at 191.  We fail to see how that decision
relates to the issues here.

Spectrum finally points to decisions addressing
preemption of state regulation prohibiting charges for mobile
service in whole-minute increments.  The relevant federal law
provides that "no State or local government shall have any
authority to regulate the entry of or the rates charged by any"
mobile telephone provider.  47 U.S.C. § 332(c)(3)(A).  The FCC
found it "clear from the language and purpose of Section 332(c)(3)
of the Act that states do not have authority to prohibit [mobile
telephone] providers from . . . charging in whole minute

increments." <u>Sw. Bell</u>, 14 F.C.C. Rcd. at 19,907. But the situation here is quite different. First, whole-minute billing is directed at the continuing provision of service rather than the period after service is terminated. Second, the pertinent statutory text in § 332(c)(3) at issue there addresses "rates charged" generally, which is distinct from "rates for the provision of cable service" in § 543.[13]

## VIII.

Because we decide that the Pro Rata Act is not preempted, we do not reach whether the Pro Rata Act is a "customer service requirement[]" exempt from preemption by virtue of § 552(d)(2). The 1984 legislative history explained that "customer service requirements" include both "disconnection" and "rebates and credits." H.R. REP. No. 98-934, at 79.[14] When Congress

---

[13] Another case Spectrum relies on found a state law that imposed a waiting period on rate changes preempted. <u>Cellco P'ship</u> v. <u>Hatch</u>, 431 F.3d 1077, 1080 (8th Cir. 2005). But <u>Cellco</u> is inapplicable because it also addresses "rates charged" generally under § 332(c)(3), for cellular service providers, instead of "rates for the provision of cable service" under § 543. <u>Id.</u> at 1080. And the law at issue in <u>Cellco</u> directly regulated on-going monthly rates by forbidding changes in the terms of service, including rate changes, during a mandatory waiting period unless subscribers consented to the changes. <u>Id.</u> at 1079.

[14] H.R. REP. No. 98-934, at 79 states:

> In general, customer service means the direct business relation between an cable operator and a subscriber. Customer service requirements include requirements related to interruption of service; disconnection; rebates and credits to consumers; deadlines to respond

- 37 -

restructured the carve-out with the 1992 Amendments, it repeated that "customer service requirements . . . relate to interruption of service; disconnection; rebates and credits to consumers;" etc. H.R. REP. No. 102-628, at 34.[15]  The Attorney General argues that the use of "requirements . . . related to disconnection" and "requirements . . . related to rebates and credits to consumers" in House Report 934 "indicates that Congress intended to permit states to enact precisely the type of legislation" that Maine has enacted.  Appellant's Br. 29.  In the light of our resolution of this case, we need not reach this issue.

---

to consumer requests or complaints; the location of the cable operator's consumer service offices; and the provision to customers (or potential customers) of information on billing or services.

[15] H.R. REP. No. 102-628, at 34 states:

The 1984 Cable Act enables a franchising authority to require, as part of a franchise, provisions for the enforcement of customer service requirements. Such requirements relate to interruption of service; disconnection; rebates and credits to consumers; deadlines to respond to consumer requests or complaints; the location of the cable operator's consumer service offices; and the provision to customers, or potential customers, of information on billing or services.

**IX.**

For these reasons we conclude that the Maine law is not a law governing "rates for the provision of cable service" but rather governs a period after the provision of cable service and is a "consumer protection law" that is not preempted.  The judgment accordingly is

**Reversed.**